Vickie L. Driver
State Bar No. 24026886
Christina W. Stephenson
State Bar No. 24049535
Christopher M. Staine
State Bar No. 24104576
Crowe & Dunlevy, P.C.
2525 McKinnon St., Suite 425
Dallas, TX 75201
Telephone: 214-420-2163
Facsimile: 214-736-1762
Email: vickie.driver@crowedunlevy.com
Email: crissie.stephenson@crowedunlevy.com
Email: christopher.staine@crowedunlevy.com

COUNSEL FOR DEBTOR

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | Chapter 11 |
| | § | |
| WEST HOUSTON MEMORY CARE, LLC,[1] | § | Case No. 19-31485-sgj-11 |
| | § | |
| Debtor. | § | |

## DEBTOR'S OBJECTION TO J&M FAMILY MANAGEMENT LLC'S APPLICATION FOR ALLOWANCE AND PAYMENT OF ADMINISTRATIVE EXPENSES PURSUANT TO 11 U.S.C. §503(b)(1)

West Houston Memory Care, LLC (the "Debtor"), debtor and debtor-in-possession in the

above captioned chapter 11 case, files its Objection (the "Objection") to the *Application for*

*Allowance and Payment of Administrative Expenses Pursuant to 11 U.S.C. §503(b)(1)* filed by

J&M Family Management LLC (the "Admin Application")[Docket No. 77]. In support of the

Objection, Debtor respectfully states as follows:

---

[1] Last four EIN 2760.

## I.     JURISDICTION AND VENUE

1.     This Court has jurisdiction to consider this Objection under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under U.S.C § 157(b).

2.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## II.     BACKGROUND

3.     On May 2, 2019 (the "Petition Date"), the Debtor and several of its affiliates[2] commenced Chapter 11 Cases by filing voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code §§ 101, *et seq.* (the "Bankruptcy Code").

4.     No trustee or examiner has been appointed in the Debtor's Chapter 11 Case.

5.     On November 23, 2020, the Debtor filed a *Motion for Orders (A) Authorizing Sale of Assets Free and Clear of All Liens, Claims, and Encumbrances, Subject to Higher and Better Offers, and (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases Motion for Order* seeking authorization to sell the Debtor's facility and substantially all of the Debtor's remaining assets to McFarlin GP Invest, LP (the "Buyer") and to assume and assign certain executory contracts and unexpired leases to the Buyer pursuant to that certain *Agreement of Purchase and Sale by and Between West Houston Memory Care, LLC and*

---

[2] Pearland Memory Care, LLC and Cinco Ranch Memory Care, LLC's First Amended Joint Plan of Liquidation was confirmed by the Court on February 28, 2020 [Docket No. 585]. Riverstone Memory Care, LLC's bankruptcy case was dismissed on March 27, 2020 [Docket No. 613]. The LaSalle Group, Inc. filed a Motion to Convert its bankruptcy case to Chapter 7 on June 30, 2020 [Docket No. 694]. An order was entered converting The LaSalle Group, Inc.'s case to one under Chapter 7 on September 16, 2020 [Docket No. 780].

*McFarlin GP Invest, LP* (the "<u>APA</u>" and attached as Exhibit "A" to this Objection). The Court ultimately approved the sale[3], and the sale closed at the end of January 2021.

6.        On February 23, 2021, J&M Family Management LLC ("<u>J&M</u>") filed its Admin Application. Pursuant to the Admin Application, J&M claims it is entitled to an allowed administrative claim in the amount of $175, 379.84.

### III.    <u>OBJECTION</u>

7.        In its Admin Application, J&M asserts an administrative claim against Debtor based on a Management Agreement and a Marketing and Accounting Services Agreement (collectively, the "<u>Agreements</u>"). However, upon information and belief, J&M did not comply with the terms of the Agreements and breached multiple provisions of both the Agreements, including, without limitation, the following:

a. failing to submit approved budgets for expenses and costs,

b. failing to manage accounts payable properly,

c. seeking reimbursement for expenses that were not reimbursable, and

d. failing to subordinate 70% of management fees when the secured debt owed to the lender was in default. *See* Section 4.1 of the Management Agreement

8.        Debtor is also unable to determine whether the expenses and fees sought in the Admin Application were incurred in compliance with the provisions and requirements of the Agreements based on Exhibit A attached to the Admin Application. Debtor objects to J&M's

---

[3] See *Order Approving Expedited Sale of Assets Free and Clear of All Liens, Claims, and Encumbrances; Approving the Assumption and Assignment of Executory Contracts; Authorizing Debtor to Consummate Transactions; and Granting Certain Other Relief* [Docket No. 56], also attached as Exhibit "B"

Exhibit A and any all amounts sought in the Admin Application that cannot be verified as due and owing under the Agreements.

9.      In addition, despite the fact that the Agreements only allowed for the paying of a maximum of 7% of the Debtor's gross revenues, analysis of the amounts paid to J&M during the Debtor's case reaches nearly 10% of gross revenues, leaving to question whether the Debtor's claims under the Agreements exceed any potential request in the Admin Application.

10.     Pursuant to Section 503(a) any entity may file a request for payment of an administrative expense. Administrative expenses under Section 503(b)(1)(A) include "the actual, necessary costs and expenses of preserving the estate, including wages, salaries or commissions for services rendered after the commencement of the case." In the Fifth Circuit, a claim is entitled to administrative expense status if it (1) arises from a transaction with the trustee (or debtor-in-possession) and (2) the goods or services supplied enhanced the ability of the debtor-in-possession's business to function as a going concern. *See In re TransAmerican Natural Gas Corp*, 978 F.2d 1409, 1416, reh'g denied, 983 F.2d 1060 (5th Cir. 1993), cert. dismissed, *In re TransAmerican Natural Gas Corp v. Toma Steel Supply, Inc.*, 507 U.S. 1048 (1993).

11.     The Debtor objects to J&M's Admin Application and requests strict proof of all amounts sought therein.

12.     The Debtor has requested additional information from J&M in an effort to resolve this claim prior to any contested hearing, if necessary. As of the filing of this Objection, the Debtor has not yet received this information. The Debtor and J&M have discussed working through an agreed scheduling order to exchange discovery and produce witnesses to the extent necessary in advance of any hearing on the Admin Application or resolution of same.

The Debtor reserves the right to supplement or amend this Objection.

WHEREFORE, the Debtor respectfully requests the Court deny the relief requested in the Admin Application and grant such other and further relief as the Debtor may be justly entitled.

Dated: March 18, 2021

Respectfully submitted,

**CROWE & DUNLEVY, P.C.**

By: */s/ Vickie L. Driver*
Vickie L. Driver
State Bar No. 24026886
Christina W. Stephenson
State Bar No. 24049535
Christopher M. Staine
State Bar No. 24104576
2525 McKinnon St., Suite 425
Dallas, TX 75201
Telephone: 214-420-2163
Facsimile: 214-736-1762
Email: vickie.driver@crowedunlevy.com
Email: crissie.stephenson@crowedunlevy.com
Email: christopher.staine@crowedunlevy.com

COUNSEL FOR DEBTOR

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing was filed with the Court and served electronically upon those parties registered to receive electronic notice via the Court's CM/ECF system on this 18th day of March, 2021.

By: */s/ Vickie L. Driver*
Vickie L. Driver

# **EXHIBIT A**

Asset Purchase Agreement

**AGREEMENT OF PURCHASE AND SALE**

**BY AND BETWEEN**

**WEST HOUSTON MEMORY CARE, LLC**

**("Seller")**

**AND**

**MCFARLIN GP INVEST, LP**

**("Purchaser")**

**Dated:  ____, 2020**

## AGREEMENT OF PURCHASE AND SALE

THIS AGREEMENT OF PURCHASE AND SALE is made and entered into as of this ____ day of November, 2020 ("**Effective Date**") by and between WEST HOUSTON MEMORY CARE, LLC, a Delaware limited liability company ("**Seller**") and MCFARLIN GP INVEST, LP, a Texas limited partnership.

## <u>RECITALS</u>

A.      Seller is the owner of that certain forty-two (42) unit, fifty (50) bed assisted living residential facility located at 1725 Eldridge Parkway, Houston, Texas (as more fully defined herein as the Improvements). The facility is currently operated by J&M Family Management, LLC, pursuant to the terms of that certain management agreement by and between Seller and J&M Family Management, LLC f/k/a TLG Family Management, LLC dated as of July 13, 2012 and that certain marketing and accounting services agreement dated as of July 13, 2012.

B.      On May 2, 2019, (the "**Petition Date**"), Seller commenced a voluntary case (the "**Bankruptcy Case**") under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court as Case No. 19-31485.

C.      Prior to the Petition Date, Origin Bank ("Origin") made a loan to the Seller (the "**West Houston Loan**") evidenced in part by that certain Promissory Note dated July 6, 2012, in the original principal amount of $8,550,000.00. The West Houston Loan was modified and extended pursuant to that certain Modification of Real Estate Lien and Note dated effective April 2, 2018 (as modified and extended, the "**West Houston Note**"). The West Houston Note was secured by, among other things, the real estate located at 1725 Eldridge Parkway, Houston, Texas 77077, as more fully described in that certain Construction Deed of Trust recorded in the official real property records of Harris County, Texas on July 16, 2012 at Document No. 20120315682 (the "**West Houston Property**"). In addition, Origin was granted a security interest in the Seller's personal property to further secure the amounts due under the West Houston Note pursuant to the terms of that certain Commercial Security Agreement dated July 6, 2012, generally describing the security as the Seller's inventory, accounts, account receivables, general intangibles, contract rights, licenses, chattel paper, machinery, furniture and fixtures, and any proceeds, products, or substitutions thereof (the "**West Houston Personal Property Collateral**," and together with the West Houston Property, the "**West Houston Collateral**")).

D.      The Bankruptcy Court entered a final Order [Dkt. 409 in the Bankruptcy Case] approving post-petition financing from Seller's pre-Petition Date lender to the Seller (the "**Final DIP Order**") on the approved terms (defined as the "**WHY DIP Facility**"), including affirming the WHY DIP Liens (as defined therein) attaching to the WHY DIP Collateral (as defined therein) to secure not only the WHY DIP Facility but also the original West Houston Note. See Docket No. 409 at paras. 9-11. As of August 31, 2020, the amount due from the Debtor under the WHY DIP Facility was an amount not less than $87,437.50, (together with interest accruing thereafter and other charges, the "**Postpetition Secured Indebtedness**").

E.      On or about June 5, 2020, McFarlin GP Invest, LP purchased from Origin, and Origin assigned to McFarlin GP Invest, LP, all of Origin's rights in and to: (a) the Prepetition

Secured Indebtedness, (b) the West Houston Collateral, (c) the Postpetition Secured Indebtedness, and (d) the WHY DIP Collateral.

     F.     Seller desires to sell to McFarlin GP Invest, LP or its assigns ("**Purchaser**"), and Purchaser desires to purchase from Seller, the Property (as that term is defined below) on the terms and conditions hereinafter set forth.

     G.     Seller and Purchaser intend to effectuate the transactions contemplated by this Agreement through a sale of the Property pursuant to Sections 105, 363, and 365 of the Bankruptcy Code; and

     H.     Seller's ability to consummate the transactions set forth in this Agreement is subject to, among other things, the entry of the Sale Order by the Bankruptcy Court.

     NOW, THEREFORE, in consideration of the foregoing and the respective promises, representations, warranties, and covenants herein contained, the parties hereto, intending to be legally bound hereby, do agree as follows:

## ARTICLE 1.

## DEFINITIONS; PURCHASE PRICE; PROPERTY

     Section 1.01.  <u>Definitions</u>.  As used in this Agreement, the terms listed below, when they appear with their initial letters capitalized, shall have the following meanings unless the context in which they occur requires otherwise:

     (a)     "Affiliate" means, as to a person or entity, any other person or entity Controlling, Controlled by or under common Control with such person or entity.

     (b)     "Agreement" means, and the words "herein," "hereof," "hereunder," and words of similar import, shall refer to, this Agreement of Purchase and Sale.

     (c)     "Assumed Liabilities" shall have the meaning set forth in Section 1.06(f).

     (d)     "Bankruptcy Code" means Title 11 of the United States Code, Sections 101 *et seq.*

     (e)     "Bankruptcy Court" shall mean the United States Bankruptcy Court for the Northern District of Texas, Dallas Division.

     (f)     "City" means the City of Houston, Texas.

     (g)     "Closing" means the consummation of the purchase of the Property by Purchaser from Seller in accordance with the terms and provisions of Section 3.01.

     (h)     "Closing Date" shall have the meaning set forth in Section 3.01.

(i)    "Control" means:

 (i)    the right to exercise, directly or indirectly, a majority of the votes which may be voted at a meeting of (A) the shareholders of the corporation, in the case of a corporation, (B) the members of the general partner, in the case of a limited partnership, or (C) the equity holders or other voting participants of a Person that is not a corporation or limited partnership; or

 (ii)    the right to elect or appoint, directly or indirectly, a majority of (A) the directors of the corporation, in the case of a corporation, (B) the managers of the general partner, in the case of a limited partnership, or (C) a majority of the Persons who have the right to manage or supervise the management of the affairs and business of a Person that is not a corporation or limited partnership. The words "Controlled" and "Controlling" have corresponding meanings.

(j)    "Cure Costs" means all monetary liabilities, including pre-Petition Date monetary liabilities, of Seller that must be paid or otherwise satisfied to cure all of Seller's monetary and other defaults under the Assumed Contracts pursuant to Section 365 of the Bankruptcy Code at the time of the assumption thereof and assignment of the Assumed Contracts to Purchaser as provided hereunder as such amounts are determined by the Bankruptcy Court.

(k)    "Deposit" means the sum of FIVE HUNDRED AND NO/100 DOLLARS ($500.00) in the form of cash which shall be delivered by Purchaser to the Title Company as more particularly set forth in Section 8.10 below. The Deposit shall be deposited in one or more federally insured money market account(s) or similar interest-bearing account(s) as utilized by the Title Company. Interest on the Deposit shall become part of the Deposit.

(l)    "Governmental Authority" means all federal, state, municipal, or other governmental instrumentalities, including federal and state courts, in each case to the extent the same has jurisdiction over the Person or property in question.

(m)    "Governmental Regulations" means any and all laws, ordinances, rules, regulations, statutes, building codes and other matters of all Governmental Authorities.

(n)    "Improvements" means all improvements, buildings, structures and fixtures placed, located, constructed or installed on the Land, including without limitation, the 42-unit senior living facility, commonly known as AUTUMN LEAVES® OF MEMORIAL CITY (the "**Facility**").

(o)    "Inspection Period" means the period commencing on the Effective Date, and expiring thirty (30) days thereafter.

(p)    "Land" means the tract(s) or parcel(s) of real property more particularly described on Exhibit "A" attached hereto and made a part hereof for all purposes.

(q)     "Management Agent" or "Manager" means J&M Family Management, LLC, f/k/a TLG Family Management, LLC, a Texas limited liability company.

(r)     "Permitted Exceptions" means those exceptions or conditions to title to the Real Property set forth in the Survey or the Title Commitment to which Purchaser does not object, or to which Purchaser shall timely object in accordance with the provisions hereof and which objections are waived by Purchaser, all as more specifically described in Section 2.06.

(s)     "Person" means any natural person, firm, corporation, general or limited partnership, limited liability company, association, joint venture, trust, estate, Governmental Authority or other legal entity, in each case whether in its own or a representative capacity.

(t)     "Personal Property" means the personal property defined in Section 1.03 hereof.

(u)     "Plans" means all plans, drawings, and specifications, and any amendments thereto, pertaining to the Land or the development thereof.

(v)     "Prepetition Secured Indebtedness" shall have the meaning given in the Recitals.

(w)     "Postpetition Secured Indebtedness" shall have the meaning given in the Recitals.

(x)     "Property" means the property defined in Section 1.03.

(y)     "Purchase Price" shall have the meaning set forth in Section 1.02.

(z)     "Resident" shall mean any person occupying a portion of the Real Property pursuant to a Resident Agreement.

(aa)     "Resident Agreements" shall mean all resident agreements or similar contracts granting to any other Person the right to use or occupy any portion of the Real Property (other than Tenant Leases) as more particularly described on Schedule 4.01(c)-1, attached hereto and made a part hereof for all purposes, together with all security and other deposits held by Seller or Management Agent thereunder.

(bb)     "Sale Order" shall mean a final, non-appealable order entered by the Bankruptcy Court authorizing the sale of the Property as contemplated herein.

(cc)     "Seller's knowledge" shall mean the current, actual knowledge of Manager, without investigation or inquiry.  Seller represents that Manager is the party affiliated with Seller that is most likely to have knowledge about the Property and the operation of the business on the Property.

4

(dd)    "Tenant Leases" shall mean the leases, licenses, concessions and similar agreements granted by Seller to any other Person the right to use or occupy any portion of the Real Property (other than the Resident Agreements) more particularly described on Schedule 4.01(c)-2, attached hereto and made a part hereof for all purposes, together with all security deposits held by Seller thereunder.

(ee)    "Title Commitment" means the Commitment for Owner's Title Insurance Policy issued by the Title Company in accordance with the terms and provisions of Section 2.01.

(ff)    "Title Company" means Lawyers Title Company, 4514 Cole Ave., Dallas, Texas 75205. Attention: Lindsay Buzbee.

(gg)    "Title Policy" means the Owner's Title Insurance Policy issued by the Title Company in accordance with the terms and provisions of Section 2.02.

(hh)    "Warranties" means all warranties and guaranties relating to the Property, or the development thereof, or to the Personal Property which are owned by Seller, if any.

Section 1.02. Purchase Price for the Property and Independent Agreement Consideration. Purchaser shall pay the following consideration (in the aggregate, the **"Purchase Price"**):

(a)    an amount equal to the aggregate amount of the Postpetition Secured Indebtedness owed to Purchaser, which amount shall be deemed satisfied in full under 11 U.S.C. § 363(k); plus

(b)    an amount equal to $6 million of the Prepetition Secured Indebtedness owed to Purchaser, which amount shall be deemed satisfied in full under 11 U.S.C. § 363(k); plus

(c)    cash in the amount equal to U.S. $415,000.00,[1] less the amount of Seller's cash on hand at Closing and less the aggregate principal amount funded of any protective advances made pursuant to the Cash Collateral Order entered at Dkt. No. 28 in the Bankruptcy Case between the date thereof and the Closing Date; plus

(d)    the assumption of the Assumed Liabilities.

(e)    The cash portion of the Purchase Price shall be payable through the Title Company, which shall act as an escrow agent for the same in order that post-Petition Date, pre-Closing payables and administrative fees of the Seller can be paid or transferred

---

[1] This calculation is based upon estimates provided by the Debtor, the Debtor's professionals and the Debtor's management company, and on which estimates McFarlin has relied; provided, however, this number is subject to change and may be amended by the agreement of both the Debtor and McFarlin. This calculation does not include any payment of past or current fees of the Debtor's management company. McFarlin may negotiate separately with the management company regarding the payment of past or current management fees.

directly to the appropriate payee on  instructions furnished by the Parties.  The Purchase Price shall be subject to the adjustments provided for in this Agreement.

(f)     The parties hereby agree that a portion of the Deposit in the amount of One Hundred and No/100 Dollars ($100.00) shall be independent consideration (the "Independent Consideration") for the termination option granted in Section 2.09.  The Independent Consideration is non-refundable and shall be retained by Seller upon the termination of this Agreement, notwithstanding any other provision of this Agreement.  In the event the Closing occurs, the Independent Consideration shall be applied to the Purchase Price.

Section 1.03.  Property.  Upon and subject to the terms and conditions provided herein, on the Closing Date, Seller will sell, transfer, assign and convey to Purchaser, and Purchaser will purchase from Seller, all of the Real Property (defined below) and all of Seller's right, title and interest in and to all tangible and intangible assets (other than the Excluded Assets described below) used in the operation of the Improvements ("**Property**"), including, without limitation, the following:

(a)     Real Property.

(i)     That certain real property consisting of the Land and the Improvements located thereon (the "**Real Property**").  The Land and all related real property shall include all permits, easements, licenses, rights-of-way, rights, and related appurtenances, if any, owned by Seller or appurtenant to the Land.

(ii)     Seller's right, title and interest as landlord (whether named as such therein, or by assignment or otherwise) in the Tenant Leases and Resident Agreements, including, without limitation, the Tenant Leases and Resident Agreements identified and described on the rent roll to be provided pursuant to Section 3.03(a) (the "**Rent Roll**"), regarding the Real Property and all amendments, modifications, supplements, renewals and extensions thereof, and refundable deposits, if any, held thereunder and any community fees held by Seller or Manager for Residents pursuant to Resident Agreements for Residents scheduled to move in after Closing.

(b)     Personal Property.

(i)     Any and all furniture, fixtures, furnishings (including all furniture, fixtures and furnishings in the model unit(s)), motor vehicles, machinery, computer hardware and any other equipment located on or used in connection with the Real Property, including, without limitation, all appliances, all heating and air conditioning systems, parking and recreational facilities and services, refrigeration, ventilation, trash disposal or other utilities, facilities and/or services owned by Seller now located upon the Real Property and used exclusively in connection with the operation or occupancy of the Real Property by Seller, and all other personal property used exclusively in connection with the Real Property and

now located upon the Real Property (excluding any personal property owned by (a) tenants occupying the Real Property under Tenant Leases, or (b) Residents).

(ii)     To the extent transferable, all existing warranties and guaranties (express or implied) issued to the Seller in connection with the Improvements or the Personal Property described in paragraph (b)(i) above, all as specifically identified on Exhibit B, Item 16, as provided to Purchaser.

(iii)     All of Seller's right, title and interest, if any, in any signs, marks, supplies, trademarks and materials located on or used in the operation of the Improvements bearing the name "Autumn Leaves of Memorial City", including but not limited to the URL or domain name of https://autumnleaves.com/communities/memorial-city/, and all assumed names used in connection with the Property.

(iv)     Without representation or warranty by Seller and to the extent owned by and in Seller's possession, all site plans, surveys, geological and environmental and soils studies and reports, market studies and surveys and reports, architectural renderings and models, plans and specifications, engineering plans and studies, floor plans, landscaping plans and other similar plans and diagrams relating thereto.

The tangible and intangible property described in paragraphs (b)(i), (b)(ii), (b)(iii) and (b)(iv) shall be referred to herein as the "**Personal Property**."

(c)     Resident Agreements and Tenant Leases.     All rights of Seller and Management Agent (if any) in, to and under all Tenant Leases and Resident Agreements, and all related Resident records, to the extent Seller or Management Agent retains any rights therein that are not included in (a)(ii) above.

(d)     Records.     True and complete copies of all of the books, records, accounts, files, logs, ledgers and journals of Seller pertaining to or used in the operation of the Property for the two (2) calendar years preceding the year of the Closing and year-to-date, including, but not limited to, any electronic data stored on computer disks or tapes, and originals of any of the foregoing to the extent in Seller's possession or control that relate to Residents of the Facility or the operation of the business associated therewith.

(e)     Licenses.     Any and all licenses now held in the name of Seller, its Management Agent or any of them and used in the operation of the Property, and any renewals, extensions, amendments or modifications thereof, as set forth on Schedule 1.03(e) attached hereto, except to the extent not transferable or assignable under applicable law.

(f)     Existing Agreements.     Existing service or professional contracts for operation of the Facility on the Property, to the extent transferable or assignable, a complete and accurate listing of which is set forth on Schedule 1.03(f) attached hereto (the "**Contracts**").     Purchaser shall review the Contracts and, on or prior to the entry of the Sale Order, Purchaser shall give notice to Seller indicating which of the Contracts that

7

Purchaser, in its sole discretion, intends to assume at Closing. Thereafter, Seller shall terminate the Contracts that Purchaser has elected not to assume on or prior to the Closing Date and Seller shall be responsible for all costs and expenses of such termination. Purchaser shall be deemed to have elected not to assume all Contracts other than those identified in Purchaser's notice, which assumed Contracts are referred to as the **"Assumed Contracts."** Notwithstanding anything herein to the contrary, the failure of Purchaser to deliver notice with regards to the Contracts shall be considered Purchaser's election to not assume any of the Contracts at Closing, including Seller's contracts with Management Agent.

(g) <u>Miscellaneous Assets</u>. Except for the Excluded Assets, any other tangible or intangible assets, properties or rights of any kind or nature not otherwise described above in this <u>Section 1.03</u> and now or hereafter owned by Seller and used exclusively in connection solely with the operation of the Property and located thereon.

(h) <u>Causes of Action Against Manager</u>. Any and all rights of Seller as against J&M Family Management, LLC, f/k/a TLG Family Management, LLC, a Texas limited liability company, arising pre-Petition or post-Petition under any applicable law, contract, or in equity.

Section 1.04. <u>Excluded Assets</u>. Notwithstanding anything to the contrary set forth above, the following assets ("**Excluded Assets**"), are not included in the Property, shall not be conveyed by Seller to Purchaser at Closing and shall be retained by Seller: (i) Seller's corporate records, (ii) computer software (whether proprietary or not) and hardware, (iii) cash held by any lender as reserves, (iv) all avoidance actions or similar causes of action arising under sections 544 through 553 of the Bankruptcy Code, including any proceedings thereof, except to the extent related to the Property or specifically to the Manager, (v) any Contracts not assumed by Purchaser pursuant to Section 1.03(f), and (vi) all general corporate trademarks, service marks, logos and insignia, goodwill, books or records of Seller (excluding Resident records) and other proprietary manuals and policies of Seller or Manager.

Section 1.05. <u>Retained Liabilities</u>. At Closing, Seller shall retain all liabilities for, and Purchaser shall not have any obligation or liability concerning:

(a) <u>Matters Arising Prior to Petition Date</u>. Any liabilities of Seller or Management Agent relating to the Property which have arisen, accrued or pertain to a period prior to the Petition Date, including, without limitation, the liability for the payment of any amounts due and payable by Seller or Management Agent or accrued but not yet due or payable by Seller or Management Agent prior to the Petition Date under any indebtedness, Contracts, Tenant Leases, Resident Agreements, and licenses or permits relating to the Property; and

(b) <u>Taxes and Assessments</u>. The payment of all taxes and assessments relating to any of the Property or the businesses associated therewith due and payable, or accrued but not yet paid, or attributable to the period of time prior to the Closing Date. Notwithstanding the forgoing, Purchaser shall be responsible for the payment of those

property taxes and penalties due to the Harris County Tax Office relating to the Property (Account #121-357-001-0004), which accrued prior to the Closing Date; and

(c)     Personal Injury; Property Damage.   Any claim for personal injury or property damage to a Person which is based on any event which occurred at the Real Property or in connection with the business associated with the Property prior to the Closing Date; and

(d)     Excluded Assets.     Any liability associated with any of the items constituting Excluded Assets; and

(e)     Litigation.     Any actual, pending litigation with respect to any of the Property or the businesses associated therewith which relates to events that occurred prior to the Closing Date (collectively, all items contained in this Section 1.05 being the "**Retained Liabilities**").

The rights and obligations of the parties under this Section 1.05 shall survive the Closing.

Section 1.06.  Assumed Liabilities.   Purchaser hereby assumes, effective as of the Closing Date, all liabilities for, and Seller shall not have any obligation or liability concerning:

(a)     Matters Arising From and After Closing Date.  Any liabilities of Purchaser relating to the Property which have arisen, accrued or pertain to a period beginning on the Closing Date, including, without limitation, the liability for the payment of any amounts due and payable by Purchaser or accrued but not yet due or payable by Purchaser from and after the Closing Date under the Tenant Leases, Resident Agreements, and licenses or permits relating to the Property; and

(b)     Taxes and Assessments.   The payment of all taxes and assessments associated with any of the Property or the businesses associated therewith due and payable or accrued, or attributable to the period of time, from and after the Closing Date, except to the extent Purchaser has received a credit for such taxes and assessments hereunder. Notwithstanding the forgoing, Purchaser shall be responsible for the payment of those property taxes and penalties due to the Harris County Tax Office relating to the Property (Account #121-357-001-0004), which accrued prior to the Closing Date; and

(c)     Resident and Tenant Agreements.  All of Seller's liabilities under the Resident Agreements and Tenant Agreements, to the extent arising at or after the Closing.

(d)     Assigned Contracts.  All of Seller's liabilities under the Assumed Contracts, if any, to the extent arising on or after the Closing Date; and

(e)     Cure Costs.     All Cure Costs required to be paid by Purchaser pursuant to the Assumed Contracts; and

(f)     Employment Matters.  Any employment and employment benefits of any employees of Manager at the Property which would accrue (or should be accrued) as an expense of Seller prior to the Closing Date, including the payment of any compensation,

accrued paid time off, sick time, personal days, any amounts accrued under any employee benefit or welfare plan of Seller or Manager or of the business associated with the Property, all of which employee benefits that have been or should have been accrued as of the date of Closing, including but not limited to unclaimed or accrued paid time off, sick time and personal days, but excluding any pre-Petition Date claims (collectively, all items contained in this Section 1.06 being the "**Assumed Liabilities**").

The rights and obligations of the parties under this Section 1.06 shall survive the Closing.

## ARTICLE 2.

## TITLE AND SURVEY; APPROVAL OF DOCUMENTS; INSPECTIONS; CONDITIONS

Section 2.01.  Title Commitment.    Within ten (10) days after the Effective Date, Purchaser, at its sole cost and expense, shall cause to be furnished to Purchaser a current basic Title Commitment, together (i) with legible copies of all instruments referred to as exceptions to title, and (ii) a current tax certificate for all tax parcels comprising the Real Property reflecting the absence of any past-due taxes on the Property for any years prior to the year of Closing. Purchaser shall also be entitled to obtain, at Purchaser's sole cost and expense, such UCC lien searches as Purchaser deems desirable.  The Title Commitment shall set forth the state of title to the Land and Improvements, together with all exceptions or conditions to such title, including, without limitation, all easements, restrictions, rights-of-way, covenants, reservations, and all other liens or encumbrances affecting the Land which would appear in an owner's title policy, if issued.  The Title Commitment shall contain the express commitment of the Title Company to issue the Title Policy to Purchaser in the amount of the Purchase Price insuring such title to the Land and Improvements as is specified in the Title Commitment, with the standard printed exceptions endorsed or deleted in accordance with Section 2.02 (to the maximum extent permitted by Governmental Regulations).

Section 2.02.  Title Policy.  At the Closing, and at Purchaser's sole expense (except to the extent otherwise specified in this Agreement), Seller shall deliver to Purchaser an Owner Policy of Title Insurance ("**Owner Policy**") issued by Title Company to Purchaser in the amount of the Purchase Price insuring that, after the completion of the Closing, Purchaser is the owner of good and indefeasible title to the Property, subject only to the Permitted Exceptions and to the standard printed exceptions included in a Texas Standard Form Owner Policy of Title Insurance; provided, however, that (i) at the election of Purchaser and at Purchaser's sole expense, the printed form survey exception shall be limited to "shortages in area," (ii) the printed form exception for restrictive covenants shall be deleted except for those restrictive covenants that are Permitted Exceptions, (iii) there shall be no exception for rights of parties in possession other than the tenants pursuant to the Tenant Leases and residents pursuant to the Resident Agreements, and (iv) the standard exception for taxes shall read:  "Standby Fees and Taxes for the year of Closing and subsequent years, and subsequent assessments for prior years due to change in land usage or ownership."

Section 2.03.  Survey.  Within one (1) business days after the Effective Date, Seller shall cause to be furnished to Purchaser, to the extent within Seller's custody and control, Seller's

existing survey (the "**Survey**") of the Land, prepared by a duly licensed land surveyor.  In the event that Purchaser desires the Survey be updated, Purchaser shall be solely responsible for all costs and expenses relating to such update.  Any update of the Survey shall be completed during the Inspection Period and be delivered to Seller and Title Company not less than ten (10) days prior to the expiration of the Inspection Period.  Any updated Survey shall be certified to Seller, Purchaser and the Title Company. To the extent the existing Survey is acceptable to Purchaser and the Title Company without modification or recertification, and to the extent required by the Title Company, Seller agrees to execute and deliver to the Title Company on or before the Closing Documents Delivery Date (defined below), an affidavit that Seller has no knowledge of further modifications or encumbrances to the Land or Improvements, except as set forth in the Survey or as disclosed by Seller in such affidavit, the form of which affidavit is attached hereto as Schedule 2.03.

Section 2.04.  Environmental Assessment.   Purchaser, at Purchaser's sole cost and expense, and in its sole discretion, may conduct a non-materially invasive "Phase I" Environmental Site Assessment, and, if recommended by the environmental consultant performing such Phase I Environmental Assessment, a "Phase II" Environmental Assessment ("**Phase II**") (with any such environmental assessment being referred to in this Agreement as an "**ESA**") of the Property, pursuant to the terms of this Agreement.  If Purchaser desires to obtain a Phase II, Purchaser shall provide Seller with a written description of the work to be performed for Seller's review and approval, not to be unreasonably withheld.

Section 2.05.  Review of Survey and Title Commitment by Purchaser.  Purchaser shall have a period until the expiration of five (5) days following receipt of the last to be delivered to Purchaser of the Title Commitment, the title exception documents, tax certificates, and the Survey, to review the Title Commitment, the copies of the exception documents and the Survey, and, if Purchaser does not terminate this Agreement in accordance with Section 2.09 hereof, deliver to Seller such objections as Purchaser may have to anything contained or set forth in the Title Commitment, the copies of the exception documents, or the Survey.  Any objection made to Seller by Purchaser's counsel within such time period shall be deemed an objection by Purchaser.  Any matters to which Purchaser does not so object within such period or as otherwise provided in this Agreement shall be deemed to be Permitted Exceptions.

Section 2.06.  Seller's Right to Cure Purchaser's Objections to Title.

(a)      If Purchaser delivers objections to Seller in accordance with Section 2.05, then Seller shall have until the expiration of five (5) days following delivery of Purchaser's objections to advise Purchaser in writing of its election to cure or refuse to cure such objections (the "**Election Notice**"); provided, however that in any and all events Seller shall, at Seller's sole cost and expense, cause all monetary liens, including without limitations mechanic's or materialman's liens, financing statements, deeds of trust and mortgages and any documents related thereto created by Seller ("**Monetary Liens**") to be satisfied in full and removed as title exceptions at or prior to Closing and in no event shall Purchaser be required to object to any Monetary Liens nor shall such liens constitute Permitted Exceptions.  In the event that Seller shall fail to timely deliver the Election Notice, Seller shall be deemed to have agreed not to cure Purchaser's objections.  In the event Seller timely delivers, or is deemed to have delivered, an Election Notice

11

which indicates Seller's refusal to cure Purchaser's objections, Purchaser may either waive such objections and close the transaction contemplated hereby or terminate this Agreement by notice delivered to Seller on or before the later of (i) five (5) business days after receipt of the Election Notice or expiration of the time to deliver such Election Notice if no such Election Notice is delivered, or (ii) the expiration of the Inspection Period. Notwithstanding Purchaser's election to waive any title objections as to Seller, Purchaser may continue to discuss and negotiate with the Title Company for the removal of, or endorsement over, one or more items reflected in the Title Commitment or Survey.

(b)     Notwithstanding anything contained herein to the contrary, if prior to Closing, the Title Company discloses to Purchaser a new exception, or amends the terms under which the Title Company is willing to issue the Title Policy, including any endorsement requested by Purchaser, or the Survey obtained by Purchaser to update or replace the Survey reflects a material item not reflected on the Survey (each, a "**Subsequent Exception**"), and such Subsequent Exception is not created by, or as a result of the actions of, Purchaser or its contractors, then Purchaser shall have seven (7) business days following Purchaser's receipt of notice from the Title Company or Surveyor, as applicable, to object to same by written notice to Seller and the Seller response period will commence again as provided in this Section 2.06 above. If Seller elects not to or fails to agree to cure or remove the Subsequent Exception as a condition of Closing within the second Seller response period, then Purchaser will have the right to terminate this Agreement within three (3) business days after the expiration of such second Seller response period, in which event the Deposit shall be promptly refunded to Purchaser and the parties shall have no further rights or obligations under this Agreement except for those provisions that expressly survive termination; provided, however, notwithstanding anything to the contrary contained in this Agreement, Seller's election not to cure, or Seller's failure to cure or remove a Subsequent Exception not caused by Seller or Management Agent shall not constitute a breach or default of this Agreement. Purchaser's failure to notify Seller of any Subsequent Exception shall be deemed to mean that such items are acceptable to Purchaser.

(c)     Notwithstanding anything to the contrary contained in this Agreement, Seller shall be obligated to obtain entry of the Sale Order ordering the sale of the Property free and clear of any liens, claims, or encumbrances pursuant to 11 U.S.C. § 363 or Monetary Objections (collectively, "**Discharge**") prior to Closing. "**Monetary Objection**" or "**Monetary Objections**" shall mean (a) any mortgage, deed of trust, assignment of rents or leases, security agreement, UCC financing statement or similar security instrument executed, assumed or otherwise authorized by Seller encumbering all or any part of Seller's interest in the Property, (b) any mechanic's, materialman's or other statutory lien field against or otherwise encumbering any of the Property to the extent arising from a matter contracted for by Seller, its Management Agent or any of Seller's Affiliates or agents, , and (c) any judgment of record against Seller that has resulted in a lien binding upon title to the Property in the applicable jurisdiction in which the Property or Seller is located.  Except only for any Monetary Objection, Monetary Liens, Subsequent Election that Seller has elected to Discharge and any Election Notice that Seller has expressly elected in a written notice to Discharge on or before the Closing (a "**Curative Objection**"), all other title insurance exception matters disclosed in or by the

12

Title Commitment and/or Survey shall be deemed a Permitted Encumbrance to the extent Purchaser does not elect timely to terminate this Agreement. Any liens of ad valorem real or personal property taxes, assessments or governmental charges affecting all or any portion of the Property that are delinquent must be cleared at Closing.

Section 2.07.    <u>Additional Items Furnished to Purchaser</u>.  Within three (3) weeks after the Effective Date, to the extent in Seller's possession, Seller shall furnish to Purchaser, true, correct, complete, and legible copies of all of the items listed on <u>Exhibit "B"</u> attached hereto (the **"Due Diligence Information"**) to the extent not previously furnished to Purchaser. Such production shall start as soon as possible after the Effective Date and shall be a rolling production of materials produced as they are made available to and confirmed by Seller.  Purchaser agrees to acknowledge to Seller receipt of the Due Diligence Information within three (3) business days after receipt thereof.  If Purchaser believes that Seller has not delivered all of the Due Diligence Information sought by Purchaser as required herein, Purchaser shall, within ten (10) business days after the Effective Date, identify in writing to Seller, with reasonable specificity, the items that Purchaser believes Seller has not delivered. Seller agrees to cooperate reasonably with Purchaser to make other information relating to the operation of the Property requested by Purchaser to the extent such information is in the possession or control of Seller.

Section 2.08.    <u>Purchaser's Right of Inspection; Application for Change of Ownership</u>.

(a)    From the Effective Date through the Closing, and making all necessary provisions for the safety and privacy of residents, Purchaser shall have reasonable access to the Property (after notice and appointment with Seller or Manager or a representative designated thereby), either personally or by authorized agent, to inspect the Property, at Purchaser's expense, including, but not limited to, the physical condition thereof, and to conduct the ESA and other property inspections, and to inspect the books, records and reports relating to the Property, pursuant to the terms of this Agreement.  Purchaser and any of its agents or consultants who desire to enter on to the Property shall have in effect and maintain commercial general liability insurance naming Seller and Management Agent as additional insureds, with limits of not less than $1,000,000.00 per occurrence, and $2,000,000.00 in the aggregate, insuring, without limitation, coverage for bodily injury, property damage, contractual liability and personal injury liability with respect to the improvements on the Property or arising out of any of Purchaser's use, inspection, due diligence activities, or occupancy of the Property, which insurance shall be issued by a reputable insurer reasonably acceptable to Seller.   Prior to entering the Property, Purchaser shall provide a certificate of insurance evidencing the type and amounts of coverages herein required.  All such tests shall be conducted by Purchaser in compliance with Purchaser's responsibilities set forth in <u>Section 2.08(c)</u> below.  A representative of Seller shall, at Seller's election, accompany Purchaser in connection with Purchaser's exercise (directly or through any of its agents or representatives) of its rights in this <u>Section 2.08(a)</u>, and Seller shall make a representative available if Seller so elects.  The terms of this <u>Section 2.08(a)</u> shall expressly survive the termination and/or the Closing of this Agreement.

(b)    At any time prior to Closing, Purchaser may prepare a change of ownership ("**CHOW**") license application together with all required submittals (other

13

than the recorded Deed (as defined in Section 3.03(a)(i) of this Agreement) to the Texas Health and Human Services Commission ("**THHS**") and to submit same to the THHS. Within one (1) business day after Closing, Purchaser will deliver the Deed and any other outstanding documentation required by THHS for approval of the CHOW to Purchaser and simultaneously furnish a copy thereof to Seller. Seller and Manager will reasonably cooperate with Purchaser in Purchaser's drafting of the CHOW application, submission of the CHOW application, and obtaining its CHOW, including, but not limited to, executing any documents required to be executed by Seller for the CHOW; however, Seller shall not be required to incur any material expense in doing so. Purchaser shall be responsible for all cost and expense in connection with obtaining THHS approvals related to the CHOW, including any fees of THHS.

(c) In conducting any inspections, investigations or tests of the Property, Purchaser and its agents or representatives shall: (a) not disturb the Residents or interfere with their use of the Property pursuant to their respective Resident Agreements; (b) not interfere with the operation and maintenance of the Property; (c) not damage any part of the Property or any personal property owned or held by any Resident or any third party; (d) not injure or otherwise cause bodily harm to Seller or its agents, guests, invitees, contractors and employees or any Residents or their guests or invitees; (e) comply with all Governmental Regulations; (f) promptly pay when due the costs of all tests, investigations, and examinations done with regard to the Property; (g) not permit any liens to attach to the Land by reason of the exercise of its rights hereunder; (h) repair any damage to the Land resulting directly or indirectly from any such inspection or tests; and (i) not reveal or disclose prior to Closing any information obtained prior to the Inspection Period concerning the Property or the Due Diligence Information to anyone other than in accordance with the confidentiality standards set forth in Section 8.16 below.

(d) At any time prior to Closing, all requests to enter onto the Property (including, without limitation, for purposes of scheduling and conducting inspections) and all requests for information about the Property shall be directed by Purchaser and its agents, employees and independent contractors to Jessica Akaah or to the senior management representatives of Management Agent from time to time designated by him (as applicable, the "**Seller Representative**"). Purchaser shall not have access to employees, Residents, tenants or occupants of the Property absent the prior written approval of the Seller Representative, which such approval shall not be unreasonably withheld, conditioned or delayed. Seller and Manager shall have the right to have one or more representatives present during any tours, investigations, tests and inspections of the Property; provided that, after reasonable notice from Purchaser, Seller's failure to have a representative of Seller present during any such entry shall not prevent Purchaser from accessing the Property accompanied solely by representatives of Manager. During the Inspection Period, Purchaser shall instruct and advise Purchaser's agents, employees and independent contractors visiting the Property not to reveal to any employees, residents, tenants or occupants of the Property (other than the Seller Representative) that such tours, investigations, tests and inspections are being done in connection with a proposed purchase of the Property, and Purchaser shall instruct its agents, employees and independent contractors to direct all questions regarding their presence to the Seller Representative. Notwithstanding anything herein to the contrary, if this Agreement

14

continues after the Inspection Period, Purchaser will be allowed to continue to review, inspect, investigate and analyze the Property until the time of Closing, but Purchaser will not be entitled to a return of the Deposit after the expiration of the Inspection Period, except to the extent otherwise provided in this Agreement.

Section 2.09.  <u>Termination</u>.

(a)  If Purchaser determines, in Purchaser's sole and absolute discretion, for any reason or no reason whatsoever, that it does not desire to acquire the Property, Purchaser shall be entitled to terminate this Agreement by written notice to Seller of such election to terminate on or prior to the expiration of the Inspection Period.  If Purchaser terminates this Agreement in accordance with this Section 2.09, Purchaser shall receive a full refund of the Deposit (less the Independent Consideration), together with all interest earned thereon, and thereafter Seller and Purchaser shall have no further obligations or liabilities hereunder, one to the other, except as may survive the termination of this Agreement.  If Purchaser fails to properly terminate this Agreement prior to the expiration of the Inspection Period, Purchaser shall have no further right of termination under this Section 2.09.

(b)  Purchaser and Seller both acknowledge and agree that nothing within this Agreement shall prohibit a third party, prior to the Closing, from submitting an offer directly to Seller to purchase the Property; provided, however, Seller may only terminate this Agreement if such third-party offer is of an amount that satisfies the Prepetition Secured Indebtedness and the Postpetition Secured Indebtedness, in full, in cash.

Section 2.10.  <u>Indemnification</u>.  Each party to this Agreement shall indemnify and hold harmless the other against and from any inaccuracy in such party's representations herein.

Section 2.11.  <u>Title Examination</u>.  PURCHASER HEREBY ACKNOWLEDGES THAT IT HAS BEEN INFORMED THAT IT SHOULD OBTAIN IN CONNECTION WITH THE PURCHASE OF THE PROPERTY A POLICY OF TITLE INSURANCE OR SHOULD HAVE AN ABSTRACT OF TITLE TO THE PROPERTY EXAMINED BY AN ATTORNEY OF ITS CHOICE.  BY PURCHASER'S EXECUTION OF THIS AGREEMENT, PURCHASER ACKNOWLEDGES THAT PURCHASER HAS BEEN SO ADVISED IN COMPLIANCE WITH THE TEXAS REAL ESTATE LICENSE ACT.

Section 2.12.  <u>"AS IS" Condition of Property</u>.  Except as expressly set forth in this Agreement, Seller makes no representations or warranties as to the Property or any information delivered by Seller to Purchaser in connection with the Property.  Purchaser represents that it is knowledgeable in commercial real estate matters, specifically including property similar to the Property and acknowledges that prior to Closing, Purchaser will have independently and personally inspected the Property and that Purchaser has entered into this Agreement based upon its ability to make such examination and inspection.  Purchaser is purchasing the property "AS IS, WHERE IS", with all faults and defects, known or unknown, latent or patent, and except as expressly set forth in this Agreement, WITHOUT ANY REPRESENTATION OR WARRANTY, ORAL OR WRITTEN, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION, ANY WARRANTIES OF FITNESS FOR A PARTICULAR PURPOSE, HABITABILITY,

MERCHANTABILITY, SUITABILITY OR QUALITY, AND IN RELIANCE ON PURCHASER'S OWN INDEPENDENT INSPECTION, INQUIRY AND/OR INVESTIGATION. SPECIFICALLY, EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, SELLER IS NOT MAKING AND SPECIFICALLY DISCLAIMS ANY WARRANTIES OR REPRESENTATIONS OF ANY KIND OR CHARACTER, EXPRESS OR IMPLIED WITH RESPECT TO THE PROPERTY, INCLUDING, BUT NOT LIMITED TO, WARRANTIES OR REPRESENTATIONS AS TO MATTERS OF TITLE (OTHER THAN SELLER'S WARRANTY OF TITLE SET FORTH IN THE SPECIAL WARRANTY DEED TO BE DELIVERED AT CLOSING), ZONING, PLATTING, SUBDIVISION, TAX CONSEQUENCES, PHYSICAL OR ENVIRONMENTAL CONDITIONS, AVAILABILITY OF ACCESS, INGRESS OR EGRESS, VALUATION, GOVERNMENTAL APPROVALS, GOVERNMENTAL REGULATIONS OR ANY OTHER MATTERS OR THINGS RELATING TO OR AFFECTING THE PROPERTY INCLUDING, WITHOUT LIMITATION: (i) THE VALUE, CONDITION, MERCHANTABILITY, MARKETABILITY, PROFITABILITY, SUITABILITY OR FITNESS FOR A PARTICULAR USE OR PURPOSE OF THE PROPERTY, (ii) THE MANNER OR QUALITY OF THE CONSTRUCTION OR MATERIALS INCORPORATED INTO ANY OF THE PROPERTY AND (iii) THE MANNER, QUALITY, STATE OF REPAIR OR LACK OF REPAIR OF THE PROPERTY. UPON CLOSING, PURCHASER SHALL ASSUME THE RISK THAT ADVERSE MATTERS, INCLUDING, BUT NOT LIMITED TO, ADVERSE PHYSICAL AND ENVIRONMENTAL CONDITIONS, MAY NOT HAVE BEEN REVEALED BY PURCHASER'S INSPECTION AND INVESTIGATIONS. THERE ARE NO ORAL AGREEMENTS, ORAL WARRANTIES OR ORAL REPRESENTATIONS, COLLATERAL TO OR AFFECTING THE PROPERTY BY SELLER, ANY AGENT OF SELLER OR ANY THIRD PARTY. SELLER IS NOT LIABLE OR BOUND IN ANY MANNER BY ANY VERBAL OR WRITTEN STATEMENTS, REPRESENTATIONS (EXCEPT AS SET FORTH IN THIS AGREEMENT), OR INFORMATION PERTAINING TO THE PROPERTY FURNISHED BY ANY REAL ESTATE BROKER, AGENT, EMPLOYEE, SERVANT OR OTHER PERSON. THE TERMS AND CONDITIONS OF THIS PARAGRAPH SHALL SURVIVE THE CLOSING AND NOT MERGE THEREIN AND AT THE OPTION OF SELLER SHALL BE REFERENCED IN THE SPECIAL WARRANTY DEED TO BE DELIVERED AT CLOSING.

## ARTICLE 3.

### THE CLOSING DATE AND THE CLOSING; OBLIGATIONS OF PURCHASER AND SELLER WITH RESPECT THERETO

Section 3.01. <u>The Closing and the Closing Date</u>. The Closing shall take place at such time or place as may be mutually agreed upon in writing by Seller and Purchaser, which is anticipated to be within thirty (30) days of entry of the Sale Order by the Bankruptcy Court (the **"Closing Date"**). At the Closing, Purchaser shall deposit the cash portion of the Purchase Price, and Seller and Purchaser shall deposit with the Title Company at least one (1) business day prior to the Closing Date ("Closing Documents Delivery Date") all documents listed in <u>Sections 3.03</u> and <u>3.04</u> hereof. The parties will use commercially reasonable efforts to conduct a mail away closing that does not require the Purchaser and Seller to present themselves in person. In the event the Closing Date specified is not a business day, the Closing shall be held on the business day next following such date.

16

Section 3.02. <u>Conditions Precedent</u>:

(a)    <u>Purchaser's Conditions</u>.

(i)    Seller shall have complied with all of its obligations set forth in <u>Section 3.03</u> of this Agreement, and shall have delivered all documents referenced in <u>Section 3.03</u> to Title Company.

(ii)    The representations and warranties of Seller in this Agreement shall be true and correct in all material respects as of the Closing (or as such other date to which such representation was expressly made).

(iii)    The covenants and obligations of Seller in this Agreement shall have been performed in all material respects, including, without limitation, delivery of all Due Diligence Information set forth on Exhibit B hereto.

(iv)    The Title Company shall have irrevocably committed to issue the Title Policy with all standard exceptions deleted or modified as described in Section 2.02 of this Agreement (to the maximum extent permitted by Governmental Regulations), insuring Purchaser's good and indefeasible fee simple title to the Real Property in the amount of the Purchase Price, subject only to the Permitted Exceptions.

(v)    No event shall have occurred with respect to any of the Property following the Effective Date and prior to the Closing Date which results in a violation of any Governmental Regulation which negatively and materially impacts the operation of the Property as a senior living facility. No governmental investigation, litigation or other court action shall have been commenced and no Governmental Regulation shall have been enacted that would make illegal or invalid or otherwise prevent the consummation of the transactions described in this Agreement. There shall be no governmental ruling or order or other proceeding which prevents the admission of new residents to the Facility, or which prevents the continued operation of the Property.

(vi)    Purchaser shall have received from THHS a notice of receipt of application for the license necessary to operate the Property in the same manner and under the same classification in effect at the Effective Date.

(vii)    Purchaser shall have received an updated Rent Roll, dated no later than as of Closing.

(viii)    Seller shall have obtained entry of the Sale Order in a form acceptable to the Purchaser.

(ix)    Seller shall terminate all property management agreements, including the property management agreement with Management Agent and all leasing, accounting and marketing agreements affecting the Property effective as of Closing, at no cost to Purchaser.

(x)   If applicable, Purchaser shall have received a fully executed copy of an Operations Transfer Agreement, which, amongst other things, outlines the responsibilities of Manager relating to the transaction contemplated under this Agreement ("**OTA**") among Purchaser (or its Affiliates or designees), Seller, and Manager.

(xi)   Purchaser shall have all required regulatory approvals, or conditional approvals, for the transaction, including, but not limited to, customary assurances of CHOW approval from the applicable state and local authorities to operate the Property.

(b)   Seller's Conditions.

(i)   Purchaser shall have complied with all of its obligations set forth in Section 3.04 of this Agreement, and shall have delivered all documents referenced in Section 3.04 to Title Company.

(ii)   The representations and warranties of Purchaser in this Agreement shall be true and correct in all material respects as of the date on which such representations were made.

(iii)   The covenants and obligations of Purchaser in this Agreement shall have been performed in all material respects.

Section 3.03.   Seller's Obligations at the Closing.

(a)   At the Closing, Seller shall do the following:

(i)   Execute, acknowledge, and deliver to Purchaser a special warranty deed (the "**Deed**") conveying good and indefeasible title in the Land and the Improvements (in accordance with the legal description shown on the Survey) to Purchaser subject only to the Permitted Exceptions;

(ii)   Execute, and deliver to Purchaser a Bill of Sale (herein so called) in the form attached hereto as Schedule 3.03(a)(iii) conveying and assigning to Purchaser all of the Property other than the Real Property;

(iii)   Credit against the Purchase Price sums required to be so credited pursuant to Section 6.02 hereof;

(iv)   Deliver to Title Company satisfactory evidence that all necessary corporate, partnership, or other action on the part of Seller, if any, has been taken with respect to the consummation of the transaction contemplated hereby;

(v)   Cause the Manager to transfer all cash on hand of the Property, less amounts necessary to satisfy checks outstanding for approved Budgeted line items (if any), to an account as directed in writing by Purchaser;

(vi)    Deliver the affidavit required by Section 8.12 hereof;

(vii)    Deliver to Purchaser a certificate confirming the accuracy of Seller's representations as of the Closing Date (subject to any modifications thereto made in accordance with the last paragraph of Section 4.01 below);

(viii)    Deliver a draft of the proposed pro rata allocations of income and expenses, to be finalized on the Closing Date;

(ix)    Deliver copies of any and all keys, locks, and safe combinations in Seller's possession, custody, or control;

(x)    Deliver a written notice of the sale by Seller and acquisition by Purchaser of the Property, which shall be transmitted to all Residents and to other parties affected by the sale and purchase of the Property (the "**Transfer Notices**") (such notice shall inform the addressees of the sale and transfer of the Property to Purchaser and contain appropriate instructions relating to the payment of future rentals and the giving of future notices);

(xi)    If applicable, cause the Manager to execute the OTA;

(xii)    Deliver to Purchaser the updated Rent Roll described in Section 1.03(a)(ii), certified as true and correct in all material respects as of the date thereof; and

(xiii)    Deliver to Purchaser such other assignments and documents as may be required pursuant to the provisions hereof or mutually agreed by counsel for Seller and Purchaser to be necessary to fully consummate the transaction contemplated hereby.

(b)    If Seller fails or is unable to deliver any of the items set forth in this Section 3.03 at the Closing, Purchaser may (i) elect to waive such failure and close the transaction, and/or (ii) exercise its rights under Section 5.01(b) hereof.

Section 3.04.    Purchaser's Obligations at the Closing.

(a)    At the Closing, Purchaser shall do the following:

(i)    Deliver the Purchase Price in accordance with Section 1.02 hereof subject to the prorations set forth in Section 6.02 hereof;

(ii)    Deliver to Seller and the Title Company satisfactory evidence that all necessary corporate, partnership, or other action on the part of Purchaser has been taken with respect to the consummation of the transaction contemplated hereby;

(iii)    Deliver the Transfer Notices.

     (iv)    Deliver the OTA (if applicable).

     (v)    Deliver to Seller such other instruments or documents as may be required pursuant to the terms hereof or mutually agreed by counsel for Seller and Purchaser to be necessary to fully consummate the transaction contemplated hereby.

     (b)    If Purchaser fails or is unable to deliver any items set forth in this <u>Section 3.04</u> at the Closing, Seller may (i) elect to waive such failure and close the transaction, or (ii) Seller may exercise its remedy under <u>Section 5.02(b)</u> hereof.

Section 3.05.  <u>Closing</u>.  Notwithstanding anything herein to the contrary, Purchaser and Seller agree that the Closing shall be accomplished by delivery to the Title Company of all documents and instruments required to be delivered at Closing, together with the Purchase Price, whereupon Title Company shall disburse such documents and the Purchase Price in accordance with the terms hereof and such additional instructions as Purchaser and Seller may deliver to Title Company, consistent with the terms hereof.

Section 3.06.  <u>Purchaser's Rights of Allocation</u>.  In connection with or at any time following the consummation of the Closing, Purchaser may, in its sole discretion, (i) allocate the applicable Property, including any Assumed Contracts, among its Affiliates, agents, designees, assigns, and/or successors, in a manner as Purchaser, in its sole discretion, deems appropriate; and (ii) allocate, assign, lease, sublease, license, sublicense, transfer, or otherwise dispose of any of the Property, including any of the Assumed Contracts, to its Affiliates, agents, designees, assignees and/or successors, with all of the rights and protections afforded to Purchaser under the Sale Order and this Agreement.

Section 3.07.  <u>Deposit</u>.  At Closing, the Deposit, together with interest thereon, shall be applied to the cash portion of the Purchase Price or as otherwise provided for <u>Section 8.10</u> below.

Section 3.08.  <u>Failure of Any Purchaser's Closing Condition</u>.  If any condition precedent to Purchaser's obligation to consummate the transactions set forth in this Agreement as set forth in <u>Section 3.02(a)</u> is not satisfied at Closing (a **"Purchaser's Closing Condition Failure"**), and, as applicable, Seller fails to cure such condition failure within fifteen (15) days after written notice is delivered by Purchaser to Seller or, within an additional period of up to sixty (60) days, if such cure cannot reasonably be completed within such 15-day period, provided Seller commences cure within such 15-day period and thereafter diligently pursues such cure (excepting a failure to satisfy the conditions set forth in <u>Section 3.02(a)(i)</u>, for which there shall be no notice or cure period); provided, however, if Seller fails to pay or otherwise satisfy any Monetary Liens or other obligations required of Seller at Closing, Purchaser shall be entitled to a credit for such amount against the Purchase Price of the Property.

Section 3.09.  <u>Failure of Any Seller's Closing Condition</u>.  If any condition precedent to Seller's obligation to consummate the transactions set forth in this Agreement as set forth in <u>Section 3.02(b)</u> is not satisfied at Closing (a **"Seller's Closing Condition Failure"**), then Seller shall have the right, in Seller's absolute discretion (unless such Seller's Closing Condition Failure was within the discretion or control of Seller), to either (i) terminate this Agreement by providing

written notice to Purchaser, in which case the Deposit shall be disbursed to Seller and the parties hereto shall have no further rights or obligations under this Agreement, except those which expressly survive the termination, or (ii) complete the transactions set out herein.

## ARTICLE 4.

## REPRESENTATIONS

Section 4.01.  <u>Representations of Seller</u>.   Seller represents to Purchaser, as of the Effective Date, as follows and Seller acknowledges and agrees that Purchaser is entitled to rely, and as of Closing shall provide a certificate reconfirming that all such representations remain true and correct as of the Closing Date:

(a)     Seller is duly formed, validly existing, in good standing in the jurisdiction of its formation, and is qualified to do business in the jurisdiction in which the Property is located and has all requisite power and authority to own the Property and conduct the business operated thereon as currently owned and conducted.

(b)     To Seller's knowledge, except as disclosed in the Title Commitment or provided to Purchaser with the Due Diligence Information, Seller has not received (i) any written notice from any Governmental Authority that any special assessments are pending, contemplated or levied in each case against the Property nor (ii) any written notice of any proposed reassessments of the Property from the local taxing agencies that would, in the reasonable judgment of Seller, materially increase real property taxes or assessments against the Property.

(c)     To Seller's knowledge, there are no adverse or other parties in possession of the Property, or of any part thereof, except (i) Seller, Management Agent, tenants under the Tenant Leases and Residents under the Resident Agreements (ii) pursuant to the Permitted Exceptions, and (iii) counterparties under those Contracts more particularly set forth on <u>Schedule 1.03(f)</u>.  To Seller's knowledge, no party has been granted any license, lease or other right relating to the use or possession of the Property, or any part thereof, except the parties described in the immediately preceding sentence.  To Seller's knowledge, the current rent roll ("**Rent Roll**") dated no earlier than two (2) days prior to the Effective Date in excel format, which will be updated (i) prior to Closing by Seller upon reasonable request of Purchaser, and (ii) at Closing and dated no earlier than the day prior to Closing, reflects accurately with respect to each Tenant Lease and Resident Agreement, the tenant or Resident, rent, lease term, any rent caps or concessions, security deposit reconciliation, and there are no other tenancy or occupancy arrangements other than as reflected on the Rent Roll.

(d)     To Seller's knowledge, there is no pending, or contemplated condemnation action affecting any part of the Property.  To Seller's knowledge, Seller has received no written notice that (i) any changes are contemplated with respect to the present zoning of the Real Property or that the use thereof or any of the other Property for the existing businesses, (ii) the condition thereof violates in any material respect any applicable recorded instruments, zoning or subdivision regulations, or other Governmental

21

Regulations. Seller has no knowledge of any condition or state of facts which would preclude, materially limit or materially restrict the use of the Property for the businesses currently operated thereon.

(e) There is no pending, or, to Seller's knowledge, any written claims of any tenants or Residents, or any threatened litigation or administrative proceeding affecting the Property or Seller, other than those matters described on Exhibit "C" attached hereto.

(f) To Seller's knowledge, Seller has not received written notice of any, violation of any Governmental Regulation from any Governmental Authority with respect to the Property, or any part thereof and to Seller's knowledge there is no such violation; and Seller has no knowledge of any ongoing investigations by the THHS other than those matters described on Exhibit "C" attached hereto.

(g) Seller has all requisite power and authority to enter into and perform its obligations under this Agreement and all other documents to be executed and delivered at Closing pursuant to this Agreement (collectively, the **"Seller's Documents"**), and each of the Seller's Documents will be upon execution the legal and binding agreement of Seller enforceable in accordance with their respective terms. All of Seller's Documents have been duly and validly authorized by all necessary action by Seller.

(h) Seller is not a foreign person or a foreign corporation for purposes of the withholding rules of the Internal Revenue Code, including but not limited to Section 1445(a) thereof.

(i) To Seller's knowledge, as of the Closing Date, there will be no management, service, supply, or other contracts between Seller or Management Agent and third parties with respect to the Property except the Assumed Contracts. Schedule 1.03(f) sets forth a true, correct and complete list of the Contracts. The copies heretofore delivered to Purchaser are true, correct and complete in all material respects. The consent of all Persons whose consent for assignment is required has been or will be secured or deemed waived by the Sale Order on or prior to the Closing Date.

(j) To Seller's knowledge, Seller is not a party to any collective bargaining agreement.

(k) To Seller's knowledge, Seller has not received written notice from any insurance carrier of defects or inadequacies in the Property. Seller shall maintain (or cause to be maintained) uninterrupted insurance coverage through the Closing Date and in accordance with Section 9.01.

(l) Seller shall not transfer the proceeds obtained as a result of this Agreement to any Person listed on the Office of Foreign Assets Control list as "Terrorists" and "Specially Designated Nationals and Blocked Persons", or otherwise be in violation of the International Money Laundering Abatement and Financial Anti-Terrorism Act of 2001.

(m)    To Seller's knowledge, Seller has filed all tax returns that it was required to file for any taxable period beginning before the Closing Date for which the statutory period of limitations for the assessment of tax, interest, penalties, or other charges has not yet expired (**"Tax Returns"**) and all taxes or other amounts owed by Seller for such taxable periods (whether or not shown as due on such Tax Returns) which could give rise to a lien or a claim against any of the Property or Purchaser have been paid.

(n)    Except for the Excluded Assets, to Seller's knowledge, all Personal Property located at the Property and used exclusively in connection with the operation of the Property is owned by Seller (or by the Management Agent on behalf of Seller) and will remain with the Property at Closing.

Seller's representations are made as of the Effective Date, and shall be continuing as stated until Closing or unless and until modified by Seller prior to Closing as provided below. The representations of Seller are made as of the Effective Date (but Seller makes no representation that there will not be a change in any of the matters referred to therein between the date hereof and the date of Closing). Seller does not, by this Agreement, represent that there will be no changes in any of the matters referred to in Seller's representations after the date same are made, and Seller shall have no liability in the event that any representation becomes false or misleading as a result of any change in circumstances which are not caused by Seller or Manager after the date such representations are made, but Seller will promptly notify Purchaser if Seller discovers that any representation has become false or misleading as a result of any change in circumstances whether or not caused by Seller or Management Agent after the date such representations are made. The foregoing shall in no way be construed to (i) relieve Seller of any liability arising in this Agreement, or (ii) limit any remedy of Purchaser in accordance with the terms of this Agreement, arising as a result of any such representation being untrue when made. The terms of this paragraph shall expressly survive termination and/or Closing of this Agreement.

Section 4.02. <u>Purchaser's Representations</u>. Purchaser represents to Seller, as of the Effective Date and as of the Closing Date, as follows:

(a)    Purchaser is a limited liability company organized, validly existing and in good standing under the laws of the State of Delaware and authorized to transact business in the State of Texas.

(b)    The execution hereof on behalf of Purchaser have been duly and validly authorized by all requisite action, and this Agreement has been duly executed and delivered by Purchaser and constitutes the legal, valid and binding obligation of Purchaser enforceable against Purchaser in accordance with the terms hereof.

(c)    Neither this Agreement nor the transaction contemplated hereby violates the terms of Purchaser's organizational documents or any other agreement to which Purchaser is bound, nor does either conflict with, or result in the breach of, any court judgment, decree, law or order of any governmental body to which Purchaser is subject.

(d)     Purchaser (i) is not a U.S. Publicly Traded Entity, (ii) is not currently identified on the Specially Designated Nationals and Blocked Persons List maintained by OFAC and/or on any other List, and (iii) is not a person or entity with whom a citizen of the United States is prohibited to engage in transactions by any trade embargo, economic sanction, or other prohibition of United States law, regulation, or Executive Order of the President of the United States.  None of the funds or other assets of Purchaser constitute property of, or are beneficially owned, directly or indirectly, by any Purchaser Embargoed Person (as hereinafter defined).  This Section 4.02(d) shall not apply to any person to the extent that such person's interest in Purchaser is through a U.S. Publicly-Traded Entity.  As used in this Agreement, "U.S. Publicly-Traded Entity" means a Person (other than an individual) whose securities are listed on national securities exchange, or quoted on an automated quotation system, in the United States, or a wholly-owned subsidiary of such Person.  The term "Purchaser Embargoed Person" means any person, entity or government subject to trade restrictions under U.S. law, including but not limited to, the International Emergency Economic Powers Act, 50 U.S.C. §1701 *et seq.*, The Trading with the Enemy Act, 50 U.S.C. App. 1 *et seq.*, and any Executive Orders or regulations promulgated thereunder with the result that the investment in Purchaser is prohibited by law or Purchaser is in violation of law.

Section 4.03.  <u>Disclaimer of Warranties</u>.  Except for the representations and warranties of Seller expressly set forth in <u>Section 4.01</u> and elsewhere in this Agreement, no representations or warranties, express or implied, shall exist with respect to the Property or the sale of the Property.

Section 4.04.  <u>Operation of Property Prior to Closing</u>.  From the Effective Date through the Closing Date, Seller shall, at Seller's sole cost and expense:

(a)     Operate the Property in the ordinary course of its business.

(b)     Maintain the Property substantially in its present condition (ordinary wear and tear and casualty excepted) and in a manner consistent with Seller's maintenance of the Property during Seller's period of ownership.

(c)     Maintain in full force and effect substantially the same liability and casualty insurance coverage that Seller or Manager now maintains in effect with respect to the Property and its operations thereat.

(d)     Keep, observe and perform in all material respects its obligations as landlord under the Tenant Leases and Resident Agreements, and not terminate or cause the termination of any Tenant Lease or Resident Agreement except as the result of the default of the counterparty thereunder or otherwise in its ordinary course of business.

(e)     Advise Purchaser promptly of any litigation, arbitration or administrative hearing before any Governmental Authority concerning or affecting the Property which, to Seller's knowledge, is instituted or threatened after the Effective Date.

(f)     Not sell, assign or convey any right, title or interest whatsoever in or to the Property, or create any lien, encumbrance or charge thereon without promptly discharging

24

the same, unless the Bankruptcy Court approves the Sale of the Property to another purchaser and Purchaser agrees to same as provided herein.

(g)    Use commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable to consummate the transactions described in this Agreement, including, without limitation, (i) obtaining all necessary consents, approvals and authorizations required to be obtained from any Governmental Authority or other Person under this Agreement, Governmental Regulations or otherwise, and (ii) effecting all registrations and filings required under this Agreement or any Governmental Regulations.  After Closing, Seller and Purchaser shall use commercially reasonable efforts (at no cost or expense to such Party, other than any *de minimis* cost or expense or any cost or expense which the requesting Party agrees in writing to reimburse) to further effect the transactions contemplated in this Agreement.

(h)    Use commercially reasonable efforts (but have no obligation) at no cost to Seller (other than de minimis amounts) to obtain estoppel certificates and deliver the same to Purchaser as of or prior to the Closing Date, from each REA Party requested in writing by Purchaser on or before the Title/Survey Objection Period (the **"Third-Party Estoppels"**), in forms reasonably satisfactory to Purchaser (or, containing only such information as is required to be contained in an estoppel certificate pursuant to the applicable title exception document).  As used herein, **"REA Party"** means a third party that is currently a party to, and bound by, a restrictive easement or similar agreement that is listed as an exception document in the Title Commitment.  If Purchaser does not terminate this Agreement prior to the expiration of the Inspection Period, and does not except to same in connection with its title and survey objections, delivery of Third-Party Estoppels shall not be a condition to Purchaser's obligation to close hereunder.

Section 4.05.  <u>Prohibited Actions Pending Closing</u>.  Unless otherwise expressly provided for herein or approved by Purchaser in writing, from the Effective Date until the Closing Date, Seller shall not, (and, as applicable, shall cause Manager and Employer not to):

(a)    Induce, solicit or entice in any targeted respect (excluding general advertising to the public) any Residents to transfer or discontinue any relationships with Seller prior to the Closing Date or with Purchaser after the Closing Date (provided that the foregoing shall not restrict Seller or Manager from enforcing any applicable terms of any Resident Agreement, including any that would result in a discontinued relationship);

(b)    Induce, solicit or entice with offers of employment or otherwise any Employee or independent contractor of Seller, Manager, or Employer to discontinue employment or to terminate or discontinue a relationship with the Facility prior to or after the Closing Date or with Purchaser after the Closing Date (other than the Excepted Employees);

(c)    Induce, solicit, or entice any Person to terminate or discontinue a relationship with Seller or Manager prior to the Closing Date or with Purchaser after the Closing Date.

25

(d)     Except for the Excluded Assets, remove any material item (equal to or greater than $2,500) of Personal Property from the Property unless the same is replaced by property of substantially equal or greater value, or unless the removal is authorized by Purchaser, in the exercise of its reasonable discretion, or pursuant to the provisions of this Agreement;

(e)     Interfere with or disrupt Purchaser's relationship with any Employee or Resident following the Closing;

(f)     Except as reflected on the Rent Roll, accept any advance payment for more than thirty (30) days in advance of the date payable under a Resident Agreement, any rent or Resident's occupancy fees under any Resident Agreement, unless such amount will be paid by Seller to Purchaser at Closing;

(g)     Make any capital improvements to the Property in excess of $2,500 in the aggregate or incur any future obligations impacting the Property in excess of $5,500 in the aggregate without Purchaser's written consent;

(h)     Sell or otherwise dispose of, or agree to sell or dispose of any of the Property, except in the ordinary course of business as permitted by this Agreement;

(i)     Following the Effective Date, not enter into any written or oral contract or other agreement, other than a Resident Agreement each based on the form previously provided to Purchaser and in the ordinary course of business, that will not be fully performed by Seller on or before the Closing Date or that will not be cancelable by Purchaser on 30 days' or more prior notice without liability on or after the Closing Date without the prior written consent of Purchaser;

(j)     Following the Effective Date, not enter into any Tenant Lease for less rent or with a smaller deposit than that currently being charged for similar units on the Property, except in Seller's ordinary course of business, without the prior written consent of Purchaser;

(k)     Following the Effective Date, not grant any bonus, free months' rental, or other concession to any present or future tenant or Resident of the Property (except (i) in the ordinary course of business and (ii) to the extent that all such bonuses or concessions shall be paid or credited prior to Closing unless otherwise approved by Purchaser) without the prior written consent of Purchaser; and

(l)     Following the Effective Date, not take any action prior to the Closing Date that would breach any of the representations and warranties contained in this Agreement.

## ARTICLE 5.

## DEFAULTS AND REMEDIES

Section 5.01.   Seller's Defaults; Purchaser's Remedies.

(a)      Seller's Defaults.  Seller shall be deemed to be in default hereunder in the event that Seller shall fail in any material respect to meet, comply with, or perform any covenant, agreement, or obligation on its part required within the time limits and in the manner required in this Agreement (other than Seller's termination of this Agreement pursuant to a right so to terminate expressly set forth in this Agreement or Purchaser's failure to perform Purchaser's obligations under this Agreement), and, such failure or event is not cured within fifteen (15) days after written notice from Purchaser to Seller of such failure or event (or, if such default cannot be reasonably cured within such 15-day period, an additional period of up to 60 days, so long as Seller commences cure within such 15-day period and diligently pursues such cure thereafter); provided, however, that such cure period may not, without the written consent of Purchaser, extend beyond Purchaser's rate lock period or loan commitment period (unless Seller reimburses Purchaser for the amount of such loan costs), and further provided, however, that no such notice or cure period shall be afforded to Seller in the event that Seller fails or refuses to consummate the sale of the Property pursuant to this Agreement at the Closing.

(b)      Purchaser's Remedies.  In the event Seller shall be deemed to be in default pursuant to Section 5.01(a) above for any reason other than Purchaser's failure to perform Purchaser's obligations under this Agreement, then Purchaser, as its sole and exclusive remedy, may take any one of the following actions: (i) enforce specific performance of this Agreement against Seller within thirty (30) days of Seller's default, whereupon such default shall be deemed irrevocably waived; provided, however, if Seller fails to pay or otherwise satisfy any Monetary Liens or other obligations required of Seller at Closing, Purchaser shall be entitled to a credit for such amount in addition to its remedy of specific performance; or (ii) terminate this Agreement. Neither the termination of this Agreement nor the enforcement of specific performance by Purchaser will relieve Seller of its indemnification obligations which survive the termination of this Agreement.

(c)      Return of Deposit.  Upon the termination of this Agreement prior to the Closing in accordance with Section 5.01(b)(ii) or other Sections hereof providing for such termination by Purchaser, the  Deposit (less the Independent Consideration), together with all accrued interest thereon, if any, shall be returned to Purchaser by the Title Company within five (5) business days of receipt of written notice from Purchaser that Purchaser has rightfully terminated this Agreement, which written notice need not be accompanied by any other document or consent of any other party hereto.  If Purchaser has properly terminated this Agreement and the Deposit is to be returned to Purchaser in accordance with this Section 5.01(c), Seller shall promptly execute and deliver such documents as may be reasonably required to cause the Title Company to return the Deposit to Purchaser.

Section 5.02.  Purchaser's Default; Seller's Remedies.

(a)    Purchaser's Defaults.    Purchaser shall be deemed to be in default hereunder in the event Purchaser shall fail in any material respect to meet, comply with, or perform any covenant, agreement, or obligation on its part required within the time limits and in the manner required in this Agreement (for any reason other than Purchaser's termination of this Agreement pursuant to a right to terminate expressly set forth in this Agreement), and, such failure is not cured within fifteen (15) days after written notice from Seller to Purchaser of such failure or event; provided, however, that no such notice or cure period shall be afforded to Purchaser in the event that Purchaser fails or refuses to consummate the purchase of the Property pursuant to this Agreement at the Closing.  Notwithstanding the foregoing, Seller's remedy for Purchaser's failure to timely deposit the Deposit shall be governed by Section 8.10.

(b)    Seller's Remedy.  In the event Purchaser shall be deemed to be in default pursuant to Section 5.02(a) above for any reason other than Seller's failure to perform Seller's obligations under this Agreement, then Seller, as its sole and exclusive remedy, may terminate this Agreement, in which event the Title Company shall deliver the Deposit to Seller within five (5) business days of receipt of written notice from Seller that it is entitled to the Deposit, it being agreed between Purchaser and Seller that such sum shall be liquidated damages for such default of Purchaser because of the difficulty, inconvenience and uncertainty of ascertaining actual damages for such default.  By signing this Agreement, each party specifically confirms the accuracy of the statements made above and the fact that each party was represented by counsel who explained the consequences of this liquidated damages provision at the time this agreement was made. If the Deposit is to be delivered to Seller in accordance with this Section 5.02(b), Purchaser agrees that no further documents from Purchaser are necessary to cause the Title Company to deliver the Deposit to Seller.  Notwithstanding anything to the contrary in this Section 5.02(b), Purchaser shall continue to be responsible for the obligations of Purchaser which survive termination of this Agreement.

## ARTICLE 6.

## CLOSING COSTS; PRORATIONS

Section 6.01.  Costs.  Costs of closing the transaction contemplated hereby shall be allocated between Seller and Purchaser as follows:

(a)    Purchaser shall pay (i) the basic premium and all endorsements to the Title Policy, (ii) the fees for recording the Deed, (iii) all costs of recording any other conveyance documents that Purchaser may choose to record, and (iv) any other charges of the Title Company.

(b)    All other expenses incurred by Seller or Purchaser with respect to the Closing, including, but not limited to, attorneys' fees of Purchaser and Seller, shall be borne and paid exclusively by the party incurring same, without reimbursement, except to the extent otherwise specifically provided in this Agreement.

Section 6.02.  <u>Prorations</u>.

(a)  <u>Taxes</u>.  Real and personal property taxes and assessments on the Property shall be prorated on the basis that Purchaser is responsible for (a) all such taxes for each fiscal year of the applicable authorities occurring prior to the Current Tax Period for which a timely claim was made in the Bankruptcy Case or on account of which a lien has attached to the Property, and (b) that portion of such taxes for the Current Tax Period determined on the basis of the number of days which have elapsed from the first day of the Current Tax Period to the day immediately preceding the Closing Date, inclusive, whether or not the same shall be payable prior to the Closing Date.  The phrase **"Current Tax Period"** means the January 1, 2020 to December 31, 2020 fiscal year of the taxing authority.

(b)  Cash on Hand.  All cash on hand, less amounts necessary to satisfy checks outstanding for approved Budgeted line items (if any), shall be transferred or credited to Purchaser at Closing.

(c)  <u>Rents</u>.  Rents and other payments due pursuant to the Resident Agreements or Tenant Leases shall be transferred to Purchaser as of the Closing Date.  Unapplied deposits received under the Resident Agreements or Tenant Leases in effect at Closing shall be transferred or credited to Purchaser at Closing.  If applicable, Purchaser shall receive from Seller a credit for any rent under a Resident Agreement or Tenant Lease that is paid to or on behalf of Seller and collected by or on behalf of Seller before the Closing to the extent that same applies to any period from and after the Closing.

(d)  <u>Post-Closing Rents</u>.  To the extent that Seller, Manager or any Person acting for or on behalf of Seller or Manager receives after the Closing any rent or other payment payable under or pursuant to a Resident Agreement or Tenant Lease that relates to the period after the Closing Date, Seller shall immediately pay or cause Manager to immediately pay such amount  to Purchaser or Purchaser's designee.

(e)  <u>General</u>.  Any other items which may be prorated, such as governmental inspection and license fees, and other revenues, utility and sewer charges and other similar items, but not insurance, shall be paid by the Purchaser as of the Closing Date. Notwithstanding the foregoing, Purchaser shall not be responsible for the payment of and does not assume any liability for any Pre-petition Claims.

(f)  <u>Accounts Receivable</u>.  Seller shall Transfer to Purchaser and Purchaser shall be entitled to collect and keep all accounts receivable or goods and services delivered or rendered prior to the Closing Date and attributable to the period prior to the Closing Date.  Seller shall reasonably assist Purchaser in collecting such accounts receivable for a period of 10 days after the Closing Date (at no cost or expense to Purchaser).  Collections of any accounts receivable by Purchaser on or after the Closing Date, after reasonable costs of collection (including postage and copying costs), shall be applied first to such tenant's or other obligor's current monthly rental and then to arrearages in the reverse order in which they were due.

(g)    Private Pay/Insurance Funds.  All private pay/insurance funds collected prior to Closing representing payment for services to be rendered on or after the Closing Date shall be paid to Purchaser at Closing.

(h)    Post-Closing Adjustments.  Seller and Purchaser agree that, to the extent items are prorated or adjusted at Closing on the basis of estimates, or are not prorated or adjusted at Closing pending actual receipt of funds or compilation of information upon which such prorations or adjustments are to be based, each of them will, upon the approval by Seller of a proper accounting prepared by Purchaser and delivered to Seller within sixty (60) days of Closing, pay to the other such amounts as may be necessary such that Purchaser will receive the benefit of all income and will pay all expenses of the Property prior to and after the Closing Date (excluding Pre-petition Claims).

## ARTICLE 7.

## COMMISSIONS

Section 7.01.  Brokerage Commissions.  Purchaser is not represented by a broker in this transaction. Seller is not represented by a broker in this transaction.  Each party shall defend, indemnify and hold harmless the other party against and from any and all Claim arising out of or in any manner relating to the alleged employment or use by such party of any real estate broker or agent in connection with the transactions contemplated by this Agreement.

## ARTICLE 8.

## MISCELLANEOUS

Section 8.01.  Binding Effect.  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors, and assigns.

Section 8.02.  Entire Agreement; Modifications.   This Agreement embodies and constitutes the entire understanding between the parties with respect to the transactions contemplated herein, and all prior or contemporaneous agreements, including without limitation, all understandings, representations, and statements, oral or written, are merged into this Agreement.   Neither this Agreement nor any provision hereof may be waived, modified, amended, discharged, or terminated except by an instrument in writing signed by the party against which the enforcement of such waiver, modification, amendment, discharge, or termination is sought, and then only to the extent set forth in such instrument. For the purpose of this Agreement, the parties expressly agree that the provisions of the Electronic Transactions Act do not apply to the exchange of emails or voicemails in connection with this Agreement, and that only a PDF image of a signed final document will serve to amend this Agreement.

Section 8.03.  Headings.  The headings contained in this Agreement are for reference purposes only and shall not in any way affect the meaning or interpretation hereof.

Section 8.04.  Interpretation and Construction.  Whenever the context hereof shall so require, the singular shall include the plural, the male gender shall include the female gender and the neuter, and vice versa.

30

Section 8.05. <u>Notice</u>. Any notice pursuant to this Agreement shall be given in writing by (a) personal delivery, (b) reputable overnight delivery service with proof of delivery, (c) United States Mail, postage prepaid, registered or certified mail, return receipt requested, or (d) legible facsimile transmission, sent to the intended addressee at the address set forth below, or to such other address or to the attention of such other person as the addressee shall have designated by written notice sent in accordance herewith, and shall be deemed to have been given (i) on the third (3rd) business day after deposit with the U.S Mail when sent by U.S. Mail to the other party at the address provided, or (ii) on the day of delivery during business hours (i.e., ending at 5:00 p.m. Dallas, Texas time) if sent by facsimile to the facsimile number provided herein, provided that an original of such facsimile is also sent to the intended addressee by means described in clauses (a) or (b) above or by regular United States Mail, postage prepaid, or (iii) the following business day when sent by reputable overnight delivery service with proof of delivery. Unless changed in accordance with the preceding sentence, the addresses for notices given pursuant to this Agreement shall be as set forth on the signature pages of this Agreement.

Section 8.06. <u>Right to Possession</u>. At the Closing, Purchaser shall have full and unrestricted right to possession of the Property, subject only to the rights of tenants under the Tenant Leases, Residents under the Resident Agreements, counterparties under those Contracts more particularly set forth on <u>Schedule 4.01(c)</u>, and to the Permitted Exceptions; and Seller will do such acts, execute such instruments, and take such action as may be reasonably appropriate or required to assure to Purchaser possession of the same. To the extent the same are not onsite at the time possession of the Real Property is conveyed, Seller will deliver or cause to be delivered to Purchaser at Closing, originals or copies of all Tenant Leases, Resident Agreements and Assumed Contracts, and all keys and key fobs, passcodes, remotes and other access or security items needed to access all aspects of the Property.

Section 8.07. <u>Further Actions</u>. In addition to the acts and deeds recited herein and contemplated to be performed, executed, and/or delivered by Seller or Purchaser, Seller and Purchaser hereby agree to perform, execute, and/or deliver or cause to be performed, executed, and/or delivered at the Closing or thereafter, any and all such further acts, deeds, and assurances as Purchaser or Seller, as the case may be, may reasonably require at the Closing to (i) evidence and vest in the Purchaser the ownership of, and title to, the Property, and (ii) consummate the transactions contemplated hereunder.

Section 8.08. <u>Governing Law; Construction</u>. This Agreement shall be construed and governed in accordance with laws of the State of Texas; venue for any action arising hereunder shall be proper only in Dallas County, Texas. The Bankruptcy Court shall have jurisdiction to enforce the Sale Order. All of the parties to this Agreement have participated fully in the negotiation and preparation hereof and, accordingly, this Agreement shall not be more strictly construed against any one of the parties hereto.

Section 8.09. <u>Attorneys' Fees</u>. Should either party employ an attorney or attorneys to enforce any of the provisions hereof or to protect its interest in any manner arising under this Agreement, the non-prevailing party in any action pursued in courts of competent jurisdiction (the finality of which is not legally contested) agrees to pay to the prevailing party all reasonable costs, damages, and expenses, including attorneys' fees, expended or incurred in connection therewith.

Section 8.10.   Deposit.  Within five (5) business days of the execution of this Agreement, Purchaser shall deliver the Deposit to the Title Company, to be held by the Title Company as escrow agent, in an interest-bearing account.  If Purchaser fails to timely deliver the Deposit to the Title Company, Seller shall have the right to terminate this Agreement by delivering written notice of such termination to Purchaser.  The Deposit, including any interest earned thereon, shall be nonrefundable to Purchaser unless (a) Purchaser has given written notice to the Title Company and Seller, prior to the expiration of the Inspection Period stipulated herein, that it does not wish to proceed to Closing, (b) Seller defaults on its obligations hereunder and fails to cure same pursuant  to Section 5.01, (c) Purchaser's Conditions Precedent to Closing fail to be satisfied or waived, or (d) Purchaser is otherwise expressly entitled to a refund of the Deposit hereunder.  The Deposit shall be credited to the Purchase Price at Closing.

Section 8.11.   Assignment.  Purchaser shall have the right without the consent of Seller to assign its rights under this Agreement and all duties hereunder to any Affiliate of Purchaser.

Section 8.12.   Foreign Person Affidavit.  At Closing, Seller shall deliver to Purchaser its affidavit in form acceptable to Purchaser, stating, under penalty of perjury, Seller's U.S. taxpayer identification number and that Seller is not a foreign person and not a disregarded entity within the meaning of Section 1445 of the Internal Revenue Code.

Section 8.13.   Time of the Essence.  With respect to all provisions of this Agreement, time is of the essence.  In the event that the date for performance of any obligation hereunder, or the giving of any notice hereunder, falls on a day other than a business day, the period for such performance, or the giving of any notice hereunder, shall be extended to the end of the next business day.

Section 8.14.   Severability.  Whenever possible, each provision of this Agreement and every related document shall be interpreted in such manner as to be valid under applicable law; but, if any provision of any of the foregoing shall be invalid or prohibited under said applicable law, such provision shall be ineffective to the extent of such invalidity or prohibition without invalidating the remainder of such provision, or the remaining provisions of such document.

Section 8.15.   Counterparts.  This Agreement may be signed in counterparts, not all of which are signed by all parties hereto but each party hereto having signed and delivered to the other at least one of them, which delivery may be by facsimile.  Any one of such counterparts, signed by the party to be charged, shall be sufficient to prove this Agreement. To facilitate execution of this Agreement, the parties may execute and exchange by telephone facsimile or electronic mail counterparts of the signature pages.

Section 8.16.   Confidentiality.  Seller  and Purchaser agree that the terms set forth in this Agreement and all Due Diligence Information shall remain confidential and shall not be revealed or disclosed to any person or party whatsoever, including without limitation the State of Texas, in connection with the filing of licensure application by Purchaser or the public through the issuance of a press release, except:  (i) with the prior written consent of the other party; (ii) as may be disclosed to each party's attorneys, accountants and other representatives that are involved in connection with the consummation of this transaction; (iii) as may be required by

applicable law, including applicable securities law; or (iv) in connection with any litigation between the parties.

Section 8.17. <u>Casualty or Condemnation</u>. The risk of loss or damage to the Property by fire or other casualty or by condemnation shall continue to be borne by Seller until Closing. If a material portion of the Property is damaged by casualty and such damage has not been fully repaired prior to the Closing Date, or if a material portion of the Property has been condemned, Purchaser shall have the option to terminate this Agreement and receive back the Deposit or to purchase the Property with an appropriate adjustment in the Purchase Price as mutually agreed to by Seller and Purchaser.

## ARTICLE 9.

## SPECIAL PROVISIONS

Section 9.01. <u>Tail Insurance</u>. At or prior to Closing, Seller shall obtain, at Purchaser's expense, insurance coverage in the amount of its existing liability insurance coverages, with coverage extending to claims made during the period of two (2) years after the Closing Date, with respect to Seller's and Manager's operations at the Community, which coverage shall not be cancelable by Seller during such two (2) years period without Purchaser's consent and which insurance, if requested by Purchaser, shall name Purchaser as additional insured thereunder and which insurance shall have no deductible payable by the insured or any additional insureds.

Section 9.02. <u>Employees</u>.

(a) Seller shall (i) provide Purchaser with a list of all employees (that details their positions, rates of pay, original hire dates and full/part time status and whether they are on medical disability or leave of absence) employed by Seller, Manager, or any of Affiliate of either ("**Employer**") at the Facility ("**Employees**" which excludes the Excepted Employees hereafter defined) at least five (5) Business Days prior to Closing, (ii) permit Purchaser or its designee to meet with Employer, Manager and the administrator of the Facility from time to time to discuss the Employees, and to advise them of Purchaser's proposed plans with respect to hiring of the Employees and the benefits which will be offered to the Employees as employees of the Purchaser, and (iii) permit Purchaser or its designee, in cooperation and coordination with Seller, Manager, Employer and the Facility administrator, to meet with Seller, Manager, and each of their respective human relations representative and the Employees reasonably request by Purchaser. The "**Excepted Employees**" are those individuals listed on **Schedule __**; provided that in no event shall any executive director or other director-level employee listed on **Schedule __** be deemed an Excepted Employee. Seller shall update (or cause to be updated) the listing of Employees and deliver such updated list to Purchaser at least two (2) Business Days prior to the Closing Date, and Purchaser shall deliver to Seller at least one (1) Business Day prior to the Closing Date a list of all the Employees who have been offered employment by Purchaser or its designee. Employer shall deliver to Seller electronic copies of the personnel files of Employees. Employer will terminate the employment of each of the Employees on the day immediately preceding the Closing Date.

33

(b)     Purchaser shall have the right to hire, on an at-will basis, all or substantially all of the active Employees who work at the Facility on the day immediately preceding the Closing Date, except for the Excepted Employees.  Purchaser, as applicable, shall condition any offers of employment to any of the Employees on the completion of Closing.  Prior to the Closing Date, Purchaser shall not solicit employment of any of Seller's or Manager's employees except for employment at the Facility and only in connection with this transaction.  If this transaction fails to successfully close, Purchaser shall not solicit any of Seller's or Manager's employees for a period of six (6) months from the date on which escrow has been terminated; provided that, the foregoing shall not prevent Purchaser from soliciting or hiring any person who responds to a general solicitation or advertisement (in any format) that is not specifically directed at the Seller's or Manager's employees.  The provisions of this Agreement, including this Section, are solely for the benefit of the Parties, and no Employee or former Employee or any other individual shall be regarded for any purpose as a third party beneficiary of this Agreement or have any cause of action or claim based on this Agreement.  In no event shall the terms of this Agreement be deemed to (i) establish, amend, or modify any employee plan or any benefit plan, program, agreement, or arrangement maintained or sponsored by Purchaser ("**Purchaser Plan**"); (ii) alter or limit the ability of Purchaser to amend, modify, or terminate any Purchaser Plan; or (iii) confer upon any employee, former employee, or any other individual any right to employment or continued employment or benefits or continued service with Purchaser.


[Signature pages follow]


34

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

**SELLER:**
WEST HOUSTON MEMORY CARE LLC


By: _____
Name: _____
Title: _____



**PURCHASER:**
MCFARLIN GP INVEST, LP, a Texas limited partnership

BY: MFG Fund GP, LLC, a Texas limited liability company

By: _____
Name: _____
Title: _____

-Signature Page-

Address for Notice

SELLER:

West Houston Memory Care, LLC
1900 Enchanted Way, Suite 200
Grapevine, TX 76051

with a copy to:

Crowe & Dunlevy, P.C.
1919 McKinney Avenue, Suite 100
Dallas, Texas 75201
Attn:  Vickie Driver
Telephone:  214-420-2142
Email Address: vickie.driver@crowedunlevy.com

Address for Notice

PURCHASER:

Matt Johnson
McFarlin GP Invest, LP
6370 LBJ Freeway, Suite 276
Dallas, TX  75240
Telephone:  (469) 619-5418
Facsimile:  (972) 385-0029
E-Mail: matt@mcfarlin-group.com

with a copy to:

Bracewell LLP
1445 Ross Avenue Suite 2100
Dallas, TX 75202-2724
Attention: Cris Baird
E-mail: cris.baird@bracewell.com

and

Thompson Coburn LLP
2100 Ross Ave., Ste. 600
Dallas, TX 75201
Attention: Katharine Battaia Clark
Email: kclark@thompsoncoburn.com

-Notice Addresses-

**Receipt of Deposit**

The undersigned hereby acknowledges receipt of the Deposit in the amount of $500.00 and agrees to hold the Deposit in accordance with the terms of the attached Agreement. The undersigned agrees to deposit such funds, together with any subsequently deposited funds, in a federally insured money market account(s) or similar interest bearing account(s) as specified by Purchaser with the interest accruing for the benefit of Purchaser.

Lawyers Title Company

By:_____

Name:_____

Title:_____

Date of execution:_____

(TO BE EXECUTED IF, AS AND WHEN
THE DEPOSIT IS DEPOSITED BY
PURCHASER)

## EXHIBIT "A"

### PROPERTY DESCRIPTION

Being all of that certain tract or parcel containing 2.613 acre (113,833 square feet) of land situated in the Joel Weaton Survey, Abstract Number 80, being out of and a part of Unrestricted Reserve "A", Block 1 of Crescent at Parkway, as recorded at Film Code 458147 of the Map Records, Harris County, Texas, said 2.613 acre tract being more particularly described by metes and bounds as follows (All bearings are based on the recorded plat of said Crescent at Parkway);

COMMENCING at a 5/8-inch iron rod with cap found in the east right-of-way line of Eldridge Road (100 feet wide) as recorded in Volume 327, Page 18 of the Map Records, Harris County, Texas, marking the southwest end of a right-of-way radius cutback line at the intersection of Crescent Plaza Drive (90 feet wide) as recorded at Film Code Number 457147 of the Map Records of Harris County, Texas and the most westerly northwest corner of said Unrestricted Reserve "A";

THENCE South 00° 00' 57" East, along the east right-of-way line of said Eldridge Road, a distance of 388.12 feet to a 5/8-inch iron rod with cap stamped "Terra Surveying" set marking the POINT OF BEGINNING and the northwest corner of the herein described tract;

THENCE North 89° 59' 03" East, over and across said Unrestricted Reserve "A", a distance of 377.34 feet to a point in the west right-of-way line of said Crescent Plaza Drive and marking the northeast corner of the herein described tract, from which a 5/8-inch iron rod with cap bears South 60° 10' 36" East 0.31;

THENCE South 00° 00' 57" East, along the west right-of-way line of said Crescent Plaza Drive, a distance of 301.67 feet to a 5/8-inch iron rod with cap stamped "Terra Surveying" set marking the southeast corner of the herein described tract;

THENCE South 89° 59' 03" West, over and across said Unrestricted Reserve "A", a distance of 377.34 feet to a 5/8-inch iron rod with cap stamped "Terra Surveying" set in the east right-of-way line of said Eldridge Road and marking the southwest corner of the herein described tract;

THENCE North 00° 00' 57" West, along the east right-of-way line of said Eldridge Road, a distance of 301.67 feet to the POINT OF BEGINNING and containing 2.613 acres (113,833 square feet) of land. This description is based on an ALTA/ACSM Land Title Survey made by Terra Surveying Company, Inc., dated January 4, 2012, TSC project number 2527-0604.

## EXHIBIT "B"

## DUE DILIGENCE INFORMATION

**Master Due Diligence Checklist**

*Autumn Leaves of West Memorial*

| # | Requested Item | Corresponding Item from PSA Exhibit | Comments | Date Delivered |
|---|---|---|---|---|
| | **Financial / Operational / Compliance:** | | | |
| 1 | Income and Operating Statements for past 5 years (monthly) --> provide in Excel; include revenue breakout by payor type and expense breakout at account level, including breakout of property and liability insurance | | | |
| 2 | Monthly detailed year-to-date operating statements in Excel | | | |
| 3 | Balance Sheet 12/31/17, 12/31/18, and YTD financials | | | |
| 4 | Rent roll in Excel | | | |
| 5 | Monthly Occupancy Reports (including move-ins and move-outs) for past 5 years | | | |
| 6 | Concession matrix existing residents, if applicable | | | |
| 7 | General Ledger | | | |
| 8 | Detailed breakouts of the components of "other income" such as signage, parking, antenna rent, etc. | | | |
| 9 | List of building employees, positions, salaries, bonuses, benefits, etc. | | | |
| 10 | Health insurance enrollment by plan type with employer and employee costs for each plan type | | | |
| 11 | Bonus program details - Provide details of annual bonus plans | | | |
| 12 | Last 2 months of payroll reports broken out by department, including hours worked by employee, pay, etc. | | | |
| 13 | A/R Aging Reports, including tenant delinquencies ,defaults and prepayments | | | |
| 14 | A/P Aging Reports | | | |
| 15 | Current and prior year real estate tax bill | | | |
| 16 | List of all personal property and building stock to be acquired with property | | | |
| 17 | List of deposits paid to utility companies or any other third party service providers | | | |
| 18 | List of tenant security deposits | | | |
| 19 | Schedule of Accounts payable and accrued liabilities | | | |
| 20 | Competitive survey, including rent comps and discussion of competition strengths and weaknesses | | | |
| 21 | Copies of all tenant lease contracts, standard tenant lease form, and other sub-leases (e.g. salon, parking) | | | |

B-1

| 22 | Copies of all utility bills & service contracts (past year, to the extent available) |
|---|---|
| 23 | State Survey History, including but not limited to all reports and notices pertaining thereto |
| 24 | Copies of State Licensure (Department of Public Health) |
| 25 | Certificate of title; ALTA Survey |
| 26 | Applicable REA or Declaration of Easements documentation / encumbrances on title |
| 27 | Maintenance work orders and log |
| 28 | Marketing materials |
| 29 | Copies of any citations / list of threatened litigation / regulatory non-compliance |
| 30 | Capital expenditures (including description/explanation) for current year to date; also provide background on any major capex issues in past year |
| 31 | Legal description & Parcel Map |
| 32 | Certificate of Occupancy |
| 33 | Use consents and final acceptance approvals with specific reference to proposed operations and any restrictions |
| 34 | Vehicle Title / Maintenance Log (include make, model, mileage and details on maintenance costs incurred) |

| **Existing Reports:** | |
|---|---|
| 35 | Existing reports including engineering, mechanical, HVAC, roof, elevators, etc. to include (if applicable) |
| o | Phase I and II environmental (phase II and remediation plans, if applicable) |
| o | Geotechnical / soils report |
| o | Property Condition Report |
| o | Appraisal |
| o | Health / Food inspection report |
| o | Fire alarm inspection |
| o | Fire sprinkler inspection |

| **Building / Plant:** | |
|---|---|
| 36 | Summary of general building information, including: |
| o | Unit and bed count by floorplan type and care level (if applicable) |
| o | Building square feet |
| o | Year opened and year acquired |
| o | Year and description of major renovations |
| 37 | Copies of all building plans, including as-builts |
| 38 | Any and all applicable licenses |
| o | Food Service |
| o | Business License |
| 39 | Equipment warranties wherever applicable |

| | |
|---|---|
| o | List of all currently in effect warranties and guaranties issued to the Seller in connection with the Improvements |

| **Third-Party / Life Safety Contracts:** | |
|---|---|
| 40 | **Copies of all contracts (including, but not limited to those detailed below) with a summary detailing term of contract, annual cost, cancellation provisions, insurance issues, assignment rights, unusual provisions, warranties, etc.** |
| o | **Fire and life safety contract** |
| o | **Copier** |
| o | **Hosting Services contract** |
| o | **Management & Accounting services** |
| o | **Janitorial Supplies** |
| o | **Uniforms** |
| o | **Cable** |
| o | **Beauty Salon** |
| o | **APFM** |
| o | **Landscape** |
| o | **HVAC contract** |
| o | **Security contract** |
| 41 | **Current policies covering:** |
| o | **Building / Property and fire insurance** |
| o | **Third party liability and water damage** |
| o | **Auto Insurance** |
| o | **Loss history/loss run for each line of coverage** |
| o | **Copy of any past professional liability application** |

| **Other / Miscellaneous:** | |
|---|---|
| 42 | **Any and all information regarding:** |
| o | **Heating, lifts / escalators, ventilation / AC, lifting equipment** |
| o | **Sprinkler systems** |
| o | **Electrical installations** |
| o | **Waste water and rain water** |
| o | **Health & safety** |
| o | **Fire detection and compliance certificates** |
| o | **Fire signage, rescue plan, escape etc.** |
| o | **Civil engineering** |
| o | **Accident insurance** |
| o | **Fuel storage** |
| o | **Smoke extraction** |
| o | **Building fabric** |
| o | **Insurance certificates** |
| o | **Security certificate (alarm, cameras etc.)** |

o  **Instruction Manuals for heating systems, elevators, HVAC, etc.**

o  **Policies and Procedures manual**

o  **Existing security plan**

o  **Security incident reports**

o  **Emergency / life safety systems**

o  **Tenant Security Deposit Detail**

o  **Resident Handbook**

o  **HOA / POA Documents**

**EXHIBIT "C"**

**PENDING PROCEEDINGS**

**SCHEDULE 1.03(E)**

**LICENSES**

(To be provided with Due Diligence Information)

**<u>SCHEDULE 1.03(F)</u>**

**CONTRACTS**

(To be provided with Due Diligence Information)

**SCHEDULE 3.03(A)(I)**

FORM OF WARRANTY DEED

NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OF THE FOLLOWING INFORMATION FROM THIS INSTRUMENT BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER. THE PREPARER OF A DOCUMENT MAY NOT INCLUDE AN INDIVIDUAL'S SOCIAL SECURITY NUMBER IN A DOCUMENT THAT IS PRESENTED FOR RECORDING IN THE OFFICE OF THE COUNTY CLERK.

SPECIAL WARRANTY DEED

THE STATE OF TEXAS §

§      KNOW ALL MEN BY THESE PRESENTS:

COUNTY OF DALLAS §

That WEST HOUSTON MEMORY CARE, LLC, a _____ (hereinafter referred to as "Grantor"), for and in consideration of the sum of Ten Dollars ($10.00) and other good and valuable consideration to it in hand paid and caused to be paid in the manner hereinafter stated by MCFARLIN GP INVEST, LP, a Texas limited partnership whose address is 6370 LBJ Freeway, Suite 276, Dallas, Dallas County, Texas, 75240 ("Grantee"), the receipt of which is hereby acknowledged and confessed, has GRANTED, BARGAINED, SOLD and CONVEYED and by these presents does GRANT, BARGAIN, SELL and CONVEY unto the said Grantee the property described on Exhibit A attached hereto, together with all improvements thereon situated (such land and improvements being called collectively the "Real Property"), and all right, title, and interest of Grantor in and to (a) adjacent streets, alley ways, and rights-of-way, (b) any adjacent strips and gores of real estate, and (c) all utility capacity, sanitary sewer, storm sewer, water and other utility rights thereto, on or under the Real Property subject to those matters listed on Exhibit B attached hereto (collectively, the "Permitted Encumbrances").

TO HAVE AND TO HOLD the above described property together with all and singular the rights and appurtenances thereto in anywise belonging, unto Grantee, its successors, executors, administrators and/or assigns, forever, and Grantor does hereby bind itself and its successors, executors, administrators, and/or assigns, to warrant and forever defend all and singular the Real Property unto Grantee, its successors, executors, administrators and/or assigns, against every person whomsoever lawfully claiming or to claim the same or any part thereof by, through or under Grantor, but not otherwise, subject to the Permitted Encumbrances.

IN WITNESS WHEREOF, the parties have executed this Special Warranty Deed to be effective as of the date first referenced above.

**SELLER:**
WEST HOUSTON MEMORY CARE, LLC

_____

_____

_____

STATE OF TEXAS    )

                 ) SS:

COUNTY OF \_\_\_\_\_)

This record was acknowledged before me on _____ 20\_\_, by _____ as Manager of _____ LLC, a _____limited liability company, on behalf of said entity.

_____

_____, Notary Public

in and for said State

EXHIBIT A

Legal Description

EXHIBIT B

Permitted Exceptions

### SCHEDULE 3.03(A)(III)

### FORM OF BILL OF SALE AND ASSIGNMENT

WEST HOUSTON MEMORY CARE, LLC a _____ ("Grantor"), for good and valuable consideration to Grantor in hand paid by MCFARLIN GP INVEST, LP, a Texas limited partnership ("Grantee"), the receipt and sufficiency of which is hereby acknowledged, does hereby sell and deliver to Grantee all of Grantor's right, title and interest, if any, in and to the Personal Property described on Exhibit A attached hereto (and as further defined in that certain Agreement of Purchase and Sale dated as of _____, 2020 between Grantor and Grantee (the "Purchase Agreement")) and hereby assigns to Grantee the Resident Agreements, Tenant Leases and Contracts, each as defined in the Purchase Agreement. Grantee hereby agrees to assume and perform or discharge all obligations of Grantor under the Resident Agreements, Tenant Leases and Contracts from and after the date of this Agreement, and to indemnify, defend and hold harmless Grantor and its affiliates from any claims, actions, liabilities, costs and expenses (including attorneys' fees and costs) arising from or relating to directly or indirectly Grantee's failure to perform or discharge any such obligation. Grantor hereby agrees to indemnify, defend and hold harmless Grantee and its affiliates from any claims, actions, liabilities, costs and expenses (including attorneys' fees and costs) arising from or relating to directly or indirectly Grantor's failure to perform or discharge any such obligations prior to the date of this Bill of Sale and Assignment.

The Personal Property is in used condition, and Grantor is neither a manufacturer, nor distributor of, nor dealer nor merchant in, said Personal Property. Grantor makes no representations, express or implied, as to the condition or state of repair of the Personal Property, including warranties of fitness or merchantability, it being expressly understood that the Personal Property is being sold to Grantee in its present "AS-IS, WHERE-IS" condition and with all faults. By acceptance of delivery of the Personal Property, Grantee affirms that it has not relied on Grantor's skill or judgment to select or furnish said Personal Property for any particular purpose, and that Grantor makes no warranty that said Personal Property is fit for any particular purpose and that there are no representations or warranties, express, implied or statutory.

Grantor is the lawful owner of the interests conveyed hereunder and hereby conveys to Grantee good and marketable title to such interests.

Grantee shall save, pay, indemnify, defend and hold Grantor harmless from any claim, liability, cost or expense (including without limitation reasonable attorneys' fees) arising out of any of the interests conveyed hereunder and from and after the date hereof. Grantor shall save, pay, indemnify, defend and hold Grantee harmless from any claim, liability, cost or expense (including without limitation reasonable attorneys' fees and costs) arising out of any of the interests conveyed hereunder and for the period prior to the date hereof. Notwithstanding any to the contrary in this Bill of Sale, Grantor's liability to indemnify and hold Grantee harmless hereunder is expressly limited by the limitation of Grantor's liability stated in the Purchase Agreement.

Grantor covenants with Grantee and Grantee covenants with Grantor that each will execute or procure any additional documents necessary to establish the rights of the other hereunder.

IN WITNESS WHEREOF, Seller has executed this Bill of Sale as of this ____ day of
_____, 2020.

**GRANTOR:**
WEST HOUSTON MEMORY CARE, LLC

By: _____
Name: _____
Title: _____

**GRANTEE:**

MCFARLIN GP INVEST, LP, a Texas limited
partnership

BY: MFG Fund GP, LLC, a Texas limited
liability company

By: _____
Name: _____
Title: _____

**SCHEDULE 4.01(C)-1**

**RESIDENT AGREEMENTS**

(To be provided with Due Diligence Information)

## SCHEDULE 4.01(C)-2

### TENANT LEASES

(To be provided with Due Diligence Information)

## SCHEDULE 2.03

Form of Survey Affidavit

SURVEY AFFIDAVIT

GF#: _____

DATE: _____, 2020

AFFIANT: _____

SURVEY: _____, certified to by _____, R.P.L.S. #_____
dated _____

BEFORE the undersigned, a Notary Public duly commissioned and qualified in the jurisdiction shown, on this day personally appeared Affiant, known or sufficiently identified to the Notary, and Affiant, after having been duly sworn by the Notary, depose and state the following:

AFFIANT is over the age of eighteen years, is fully competent to make this Affidavit and has personal knowledge of the matters stated herein.

THE Affiant, having current and actual knowledge of the matter hereinafter set forth, after being duly sworn, depose and state, that:

THAT I have personally inspected the real property referenced on Exhibit "A" attached hereto and made a part hereof for all purposes (the "Property"). I understand that (i) Lawyers Title Company, and its underwriter, have been requested to provide certain survey coverage in an Owner Policy of Title Insurance and/or a Loan Policy of Title Insurance; and (ii) typically a new survey is required in order to provide the requested title insurance coverage to the Purchaser and/or the Lender.

THAT a true and correct copy of the survey of the Property (the "Survey") is attached hereto as Exhibit "B".

THAT I am personally familiar with and have actual knowledge of the conditions of the Property on and after the date of the Survey. Accordingly, I am in position to make the following factual representations.

THAT since the effective date of the current Survey (referenced above), there have been: (i) no changes in the location of boundary fences or boundary walls on the Property; or (ii) no improvements are on the Property which affect any building lines, easements or rights of way located on the subject property or which encroach upon easements, rights of way or adjoining property. There are: (iii) no changes in the location of boundary fences or boundary walls on the adjoining property which affect the Property; (iv) no new improvements have been constructed on the adjoining property which affect any building lines, easements or rights of way located on

the Property or which encroach upon easements or rights of way on the Property; and (v) no new easements have been granted and there have been no other changes which would affect any building lines, easements or rights of way located on the Property or which encroach upon easements or rights of way on the Property.

I understand that Lawyers Title Company. as agent for its underwriter, will cause to be issued an Owner Policy of Title Insurance and/or a Loan Policy of Title Insurance, in reliance upon and in consideration of the factual representations set forth in this letter.    I further understand that there are substantial civil and criminal penalties for knowingly making false statements in connection with a real estate transaction.

THAT this Affidavit is made to Lawyers Title Company and its underwriter (collectively called the "title company") as an inducement to them to complete the above referred transaction, and I realize that said title company, is relying upon the representations contained herein in insuring this transaction, and I hereby swear under the penalties of perjury that the foregoing information is true and correct in all respects.

AFFIANT affirms the above statements, as true and correct.

FURTHER Affiant sayeth not.

_____

Affiant

ACKNOWLEDGED, SUBSCRIBED AND SWORN TO BEFORE ME, this _____ day of _____, 2020, by _____.

_____

Notary Public, State of _____

_____

Notary Printed Name

_____

My Commission Expires

Sched 2.03

EXHIBIT "A"

EXHIBIT "B"

(Survey attached hereto)

**<u>EXHIBIT B</u>**

Order Approving Expedited Sale of Assets



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed December 29, 2020**

United States Bankruptcy Judge

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | Chapter 11 |
| | § | |
| WEST HOUSTON MEMORY CARE , LLC[1] | § | Case No. 19-31485-sgj-11 |
| | § | |
| Debtor. | § | |

**ORDER APPROVING EXPEDITED SALE OF ASSETS FREE AND CLEAR OF ALL
LIENS, CLAIMS, AND ENCUMBRANCES; APPROVING THE ASSUMPTION AND
ASSIGNMENT OF EXECUTORY CONTRACTS; AUTHORIZING DEBTOR TO
CONSUMMATE TRANSACTION; AND GRANTING CERTAIN OTHER RELIEF**
[Relates to Dkt. No. 34]

Having considered the *Expedited Motion for Orders (A) Authorizing Sale of Assets Free
and Clear of All Liens, Claims, and Encumbrances, Subject to Higher and Better Offers, (B)
Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases; (C)
Authorizing the Debtor to Consummate the Transaction; and (D) Granting Certain Other Relief
as more fully described therein* [Dkt. No. 34] (the "Motion"),[2] and the Court having conducted a

---

[1] Last four EIN 2760.

[2] Capitalized terms used but not defined herein shall have the means ascribed in them in the Motion.

ORDER APPROVING SALE OF ASSETS AND APPROVING ASSUMPTION AND
ASSIGNMENT OF EXECUTORY CONTRACTS – Page 1

hearing on December 22, 2020 (the "Sale Hearing"), at which time all parties in interest were offered an opportunity to be heard with respect to the Proposed Sale of the Sale Assets, and the Court having considered: (i) the Motion and any objections thereto; (ii) the Proposed Sale of the Sale Assets by Debtor to McFarlin GP Invest, LP ("McFarlin") (or its assigns, designees, or successors); (iii) the arguments of counsel made, and evidence adduced, related thereto at the Sale Hearing; (iv) the full record in the Debtor's Chapter 11 Case and those of its affiliates; and it appearing that the relief requested in the Motion is in the best interests of the Debtor, its estate, its creditors, and all parties in interest; it is hereby

FOUND, CONCLUDED, AND DETERMINED THAT:[3]

A.    The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this Chapter 11 Case pursuant to Bankruptcy Rule 9014, and supplement all findings of fact and conclusions of law announced by the Court on the record at the Sale Hearing to the extent not inconsistent herewith.

B.    The Court has jurisdiction over these matters pursuant to 28 U.S.C. §§ 157 and 1334; venue of this proceeding and this Motion are proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409; consideration of this Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2); and the statutory bases for relief requested in the Motion are Bankruptcy Code sections 105(a), 363, and 365 and Bankruptcy Rules 2002, 4001, 6004, 6006, and 9014.

C.    This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under

---

[3] To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, this Court finds that time is of the essence in effectuating the APA and that there is no just reason for delay in the implementation of this Order. Accordingly, cause exists to modify the stay contemplated by Bankruptcy Rules 4001(a) and 6004(h) and permit the immediate effectiveness of this Order.

D. The Sale Assets constitute property of Debtor's estate and title thereto is vested in Debtor's estate within the meaning of Bankruptcy Code section 541(a).

E. On May 2, 2019 (the "Petition Date"), the Debtor and several of its affiliates commenced the above-captioned Chapter 11 Case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

F. The Debtor continues to operate its business and manage its property as a debtor-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

G. No trustee or examiner has been appointed in the Debtor's Chapter 11 Case, and no committee of unsecured creditors has been appointed.

H. On May 21, 2019, the United States Trustee appointed Susan N. Goodman as the Patient Care Ombudsman ("PCO") for the Debtor.

I. Good, sufficient, and appropriate notice, under the circumstances, of the Motion and the Sale Hearing was provided to each party entitled to such notice, including, as applicable: (i) all entities known to have expressed a bona fide interest in a transaction with respect to the Sale Assets since the Petition Date; (ii) all entities known to have asserted any lien, claim or encumbrance in or upon any of the Sale Assets; (iii) all federal, state and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief

requested by the Motion; (iv) the U.S. Trustee; (v) the PCO; (vi) the Internal Revenue Service; (vii) and all persons and entities that have requested service of filings in this Chapter 11 Case pursuant to Bankruptcy Rule 2002. All parties in interest have been provided a reasonable opportunity to object or be heard regarding the relief requested in the Motion, and no other or further notice of the Motion or Sale Hearing is, or shall be, required.

J.    The Debtor and its professionals marketed the Sale Assets prior to and following the Petition Date.  Based on the record of these proceedings, creditors and other parties in interest and prospective purchasers were afforded a reasonable and fair opportunity to make an offer to purchase the Sale Assets.

K.    The disclosures the Debtor made in the Motion and at the Sale Hearing concerning the Proposed Sale were good, complete and adequate. The APA and the Proposed Sale contemplated thereby represent a fair and reasonable offer to purchase the Sale Assets under the circumstances of this Chapter 11 Case and present the best opportunity to realize the value of the Sale Assets on a going-concern basis and avoid decline and devaluation of the Sale Assets. No other entity or group of entities has presented a higher and better offer to Debtor to purchase the Sale Assets, and no other transaction would yield as favorable an economic result. The APA and the Proposed Sale must be approved and the Closing must occur promptly to preserve the value of the Debtor's assets.

L.    The Debtor has articulated good and sufficient reasons for this Court to grant the relief requested in the Motion, the Debtor's determination to enter into the APA constitutes a valid and sound exercise of the Debtor's business judgment, and the Proposed Sale should be approved.

M.     The consideration McFarlin is providing pursuant to the APA, including but not limited to the Purchase Price: (i) was negotiated at arm's length; (ii) is fair and adequate; and (iii) constitutes reasonably equivalent value and fair consideration for the Sale Assets under the Bankruptcy Code and applicable non-bankruptcy law.

N.     McFarlin is purchasing the Sale Assets in good faith and is a good-faith buyer within the meaning of Bankruptcy Code section 363(m) and is not an "insider" of any Debtor (as defined under Bankruptcy Code section 101(31)), and, therefore, is entitled to the full protections of that provision, and otherwise has proceeded in good faith in all respects in connection with this Chapter 11 Case in that: (1) McFarlin recognized that the Debtor was free to deal with any other party interested in acquiring the Sale Assets; (2) all payments to be made by McFarlin and other agreements or arrangements entered into by McFarlin in connection with the Proposed Sale have been disclosed; (3) McFarlin has not violated Bankruptcy Code section 363(n) by any action or inaction; and (4) the negotiation and execution of the APA, including the Proposed Sale contemplated thereby, was completed by the Debtor and McFarlin in a diligent, non-collusive, fair, arms' length, and good-faith manner. Specifically, McFarlin has not acted in a collusive manner with any person, including any other potential buyer, nor was it controlled by any agreement among bidders. McFarlin's prospective performance and payment of amounts owing under the APA are in good faith and for valid business purposes and uses.

O.     The APA and the transactions contemplated thereby cannot be avoided under section Bankruptcy Code 363(n). The Debtor and McFarlin have not engaged in any conduct that would cause or permit the APA or the consummation of the transactions contemplated thereby to be avoided, or costs or damages to be imposed, under section Bankruptcy Code 363(n).

Moreover, neither the Debtor nor McFarlin has entered into the APA or is consummating the Proposed Sale with any fraudulent or otherwise improper purpose.

P.    By consummating the Proposed Sale, McFarlin is not a mere continuation of the Debtor or its estate, and there is no continuity between McFarlin and the Debtor. McFarlin is not holding itself out to the public as a continuation of the Debtor. McFarlin is not a successor to the Debtor or the Debtor's estate by reason of any theory of law or equity, and the Proposed Sale does not amount to a consolidation, merger, or de facto merger of McFarlin and the Debtor. Except as provided in the APA, neither McFarlin, nor any of its affiliates, assigns, designees, or successors shall assume any obligation or liability of the Debtor, its estate, or of the Manager. Neither the disposition of the Sale Assets pursuant to the APA nor entry into the APA will subject McFarlin to any liability for claims, obligations, or Interests or Claims (as defined below) asserted against the Debtor or the Debtor's interests in such Sale Assets by reason of such transfer under any laws, including without limitation any bulk-transfer laws or any theory of successor continuity or similar theories.

Q.    The Proposed Sale neither impermissibly restructures the rights of the Debtor's creditors nor impermissibly dictates the terms of a liquidating plan of reorganization of the Debtor. The Proposed Sale does not constitute a *sub rosa* plan.

R.    The Debtor, acting by and through its existing agents, representatives, and officers, has full corporate power and authority to execute and deliver the APA and all other documents contemplated thereby, and the Debtor requires no further consents or approvals for the Debtor to consummate the Proposed Sale contemplated by the APA, except as otherwise set forth in the APA.

S.    The transfer of each of the Sale Assets to McFarlin will be, subject to the consummation of the Closing, a legal, valid, and effective transfer of such assets, and vests or will vest McFarlin with all right, title, and interest of Debtor to the Sale Assets free and clear of all Interests or Claims (as defined below) accruing, arising or relating thereto any time prior to the consummation of the Closing, unless otherwise assumed pursuant to the APA, with such Interests or Claims to attach to the proceeds of the Proposed Sale of the Sale Assets with the same validity and priority as such Interests or Claims applied against the Sale Assets immediately prior to the consummation of the Closing, except as otherwise specifically provided APA.

T.    Debtor may sell the Sale Assets pursuant to the APA free and clear of all Interests or Claims against the Sale Assets (unless otherwise assumed in the APA) because, in each case, the standards set forth in Bankruptcy Code section 363(f)(1)-(5) has been satisfied. Those holders of Interests or Claims against the Sale Assets who did not object, or who withdrew their objections, to the Proposed Sale or the Motion are deemed to have consented thereto pursuant to Bankruptcy Code section 363(f)(2). Those holders of such Interests or Claims against the Sale Assets who did object fall within one or more of the other subsections of section 363(f) and are adequately protected by having their Interests or Claims against the Sale Assets, if any, in each instance against Debtor, its estate, or any of the Sale Assets, attach to the proceeds of the Proposed Sale, in the same order of priority, with the same validity, force, and effect that such creditor had immediately prior to the Closing of the Proposed Sale, subject to any claims and defenses that Debtor may possess with respect thereto.

U.    If the Proposed Sale were not free and clear of all Interests or Claims against the Sale Assets (except as otherwise assumed in the APA), or if McFarlin would, or in the future

could, be liable for any of the Interests or Claims against the Sale Assets (except as otherwise assumed in the APA), McFarlin would not have submitted the APA and would not consummate the Proposed Sale, thus adversely affecting the Debtor, its estate, the residents the Debtor serves, and its creditors. Therefore, approval of the APA and the consummation of the Proposed Sale free and clear of all Interests or Claims (subject to the terms and conditions of the APA and this Order) is appropriate pursuant to Bankruptcy Code section 363(f) and is in the best interests of the Debtor's estate, its creditors and other parties in interest.

V.     The Debtor has demonstrated compelling circumstances and good and sufficient cause exists for (i) considering the Motion on an expedited basis; and (ii) granting the relief in the Motion.

ACCORDINGLY, IT IS HEREBY ORDERED that:

1.     The Motion is GRANTED as set forth herein.

2.     Any and all objections and responses to the Motion that have not been withdrawn, waived, settled, or resolved, and all reservations of rights included therein, are hereby overruled and denied on the merits.

3.     Notice of the Motion, the Sale Hearing, and the Proposed Sale was fair, appropriate, and equitable under the circumstances and complied in all respects with Bankruptcy Code section 102(1) and Bankruptcy Rules 2002, 6004, and 6006.

4.     Pursuant to Bankruptcy Code section 363(b), the APA is approved, and each of the Debtor and McFarlin, acting by and through its existing agents, representatives and officers, is authorized, empowered, and directed to take any and all actions necessary or appropriate to: (a) consummate the Proposed Sale pursuant to and in accordance with the terms and conditions of

the APA; (b) consummate the Proposed Sale as contemplated in the APA and this Order; (c)

transfer and assign all right, title, and interest to all property, licenses, and rights to be conveyed

in accordance with the terms and conditions of the APA; and (d) execute and deliver, perform

under, consummate, and implement the APA, and all additional instruments and documents, that

may be reasonably necessary or desirable to implement the APA and the Proposed Sale or any

other ancillary documents, or as may be reasonably necessary or appropriate to the performance

of the obligations as contemplated by the APA, and such other ancillary documents. No other

consents or approvals are necessary or required for the Debtor to carry out the Proposed Sale and

effectuate the APA and the related actions contemplated or set forth therein.

5.      This Order shall be binding in all respects on the Debtor, its estate, all creditors, all

holders of equity interests in the Debtor, all holders of any Interests or Claims (whether known or

unknown) against the Debtor, any holders of Interests or Claims against or on all or any portion

of the Sale Assets, all counterparties to any executory contract or unexpired lease of the Debtor,

McFarlin and all successors and assigns of McFarlin, and any trustees, examiners, or other

fiduciary under any section of the Bankruptcy Code, if any, subsequently appointed in the

Debtor's Chapter 11 Case or upon a conversion to chapter 7 under the Bankruptcy Code of the

Debtor's case.

6.      The terms and provisions of the APA and this Order shall inure to the benefit of the

Debtor's estate, the Debtor's creditors, and the Debtor and McFarlin and their respective

Affiliates, successors and assigns, and any other affected third parties, including all persons

asserting any Interests or Claims in the Sale Assets to be sold to McFarlin pursuant to the APA,

notwithstanding any subsequent appointment of any trustee, party, entity, or other fiduciary under

any section of any chapter of the Bankruptcy Code, as to which trustee, party, entity, or other fiduciary such terms and provisions likewise shall be binding. The provisions of this Order and the terms and provisions of the APA, and any actions taken pursuant hereto or thereto shall survive the entry of any order that may be entered confirming or consummating any plan of the Debtor or converting the Debtor's case from chapter 11 to chapter 7.

7.    Pursuant to Bankruptcy Code sections 105(a), 363(b), 363(f), 365(b) and 365(f), subject to the terms and conditions of this Order and consummation of the Closing, the Debtor's transfer of the Sale Assets pursuant to the APA shall vest McFarlin or its assigns with all of the Debtor's right, title, and interest in and to the Sale Assets free and clear of liens, claims, encumbrances, defenses, and interests (other than the Assumed Liabilities and any other obligations imposed by the APA), in each case, whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, whether arising prior to or subsequent to the commencement of this Chapter 11 Case, and whether imposed by agreement, understanding, law, equity or otherwise, including without limitation: (i) mortgages, deeds of trust, pledges, charges, security interests, rights of first refusal, hypothecations, encumbrances, servitudes, leases or subleases, rights-of-way, encroachments, restrictive covenants, restrictions on transferability or other similar restrictions, rights of offset or recoupment, right of use or possession, subleases, leases, condition sale arrangements, or any similar rights; (ii) all claims as defined in section 101(5) of the Bankruptcy Code, including, without limitation, all rights or causes of action (whether in law or equity), proceedings,

warranties, guarantees, indemnities, rights of recovery, setoff, recoupment, indemnity or

contribution, obligations, demands, restrictions, indemnification claims, or liabilities relating to

any act or omission of the Debtor or any other person, consent rights, options, contract rights,

covenants, and interests of any kind or nature whatsoever (known or unknown, matured or

unmatured, accrued, or contingent and regardless of whether currently exercisable), whether

arising prior to or subsequent to the commencement of this Chapter 11 Case, and whether

imposed by agreement, understanding, law, equity or otherwise; (iii) all debts, liabilities,

obligations, contractual rights and claims, and labor, employment and pension claims; (iv) any

rights based on any successor or transferee liability; (v) any rights that purport to give any party a

right or option to effect any forfeiture, modification, right of first offer or first refusal, or

consents, or termination of the Debtor's or McFarlin's interest in the Sale Assets, or any similar

rights; (vi) any rights under labor or employment agreements; (vii) any rights under pension,

multiemployer plan (as such term is defined in section 3(37) or section 4001(a)(3) of the

Employment Retirement Income Security Act of 1974 (as amended, "ERISA"), health or welfare,

compensation or other employee benefit plans, agreements, practices, and programs, including,

without limitation, any pension plans of the Debtor or any multiemployer plan to which the

Debtor has at any time contributed to or had any liability or potential liability; (viii) any other

employee claims related to worker's compensation, occupation, disease, or unemployment or

temporary disability, including, without limitation, claims that might otherwise arise under or

pursuant to (a) ERISA, (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of

1964, (d) the Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the

Age Discrimination and Employment Act of 1967 and Age Discrimination in Employment Act,

each as amended, (g) the Americans with Disabilities Act of 1990, (h) the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, including without limitation the requirements of Part 6 of Subtitle B of Title I of ERISA and Section 4980B of the Internal Revenue Code of any similar state law, (i) state discrimination laws, (j) state unemployment compensation laws or any other similar state laws, (k) any other state or federal benefits or claims relating to any employment with the Debtors or any of their predecessors, or (1) the WARN Act (29 U.S.C. §§ 2101, et seq.); (ix) any bulk sales or similar law; (x) any tax statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended, and any taxes arising under or out of, in connection with, or in any way relating to the operation of the Acquired Assets prior to the Closing; (xi) any unexpired and executory contract or unexpired lease to which a Debtor is a party that is not a Designated Contract; and (xii) any other Excluded Liabilities under the APA (collectively, the "Interests or Claims"), with all such Interests or Claims to attach to the proceeds of the Proposed Sale in the order of their priority, with the same validity, force, and effect that they have immediately prior to the consummation of the Closing as against the Sale Assets, subject to any claims and defenses the Debtor may possess with respect thereto. Furthermore, except as otherwise provided in the APA, McFarlin and/or its Affiliates, assigns, designees, or successors shall not have any liabilities for the prepetition or pre-Closing Date conduct of the Debtor or any of its officers, directors, employees, or agents.

8.      Notwithstanding any provisions set forth herein, any outstanding ad valorem taxes, including the 2020 taxes, owed to Harris County Improvement District #6 and the Harris County Tax Office (together the "Taxing Authorities") in relation to the Sale Assets, including statutory interest at the applicable non-bankruptcy rate as provided under Texas law (the "Unpaid Taxes"),

shall be paid at the time of Closing.  The Taxing Authorities shall retain their Liens against the Sale Assets until the Unpaid Taxes are paid in full. The tax liens for the 2021 taxes are specifically retained by Texas Taxing Authorities until the 2021 taxes are paid in full, when due, and the Purchaser assumes the personal liability for such 2021 taxes.

9.    The Debtor will not close the sale unless an agreement is signed and in place with a qualified management company at close and the CRO is satisfied, along with our PCO, that the sale and its transition will not be harmful to the residents

10.    In addition, the employees working on site at the Debtor's property will be retained on payroll through and including January 18, 2020, unless hired at an earlier date by McFarlin, its successors, or assigns.

11.    Upon consummation of the Closing, this Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of all of the Sale Assets or a bill of sale transferring good and marketable title in such Sale Assets to McFarlin pursuant to the terms and allocations set forth in the APA. For the avoidance of doubt, the Excluded Assets set forth in the APA are not included in the Sale Assets.

12.    Subject to the terms and conditions of this Order, the transfer of Sale Assets to McFarlin pursuant to the APA and the consummation of the Proposed Sale and any related actions contemplated thereby (x) do not require any consents other than as specifically provided for in the APA, and (y) will, upon consummation of the Closing, constitute a legal, valid, and effective transfer of the Sale Assets.

13.    To the greatest extent available under applicable law and except as provided in the APA, McFarlin, as provided by the APA, shall be authorized, upon consummation of the

ORDER APPROVING SALE OF ASSETS AND APPROVING ASSUMPTION AND
ASSIGNMENT OF EXECUTORY CONTRACTS – Page 13

Closing, to operate under any license, permit, registration, and governmental authorization or approval of the Debtor with respect to the Sale Assets, and all such licenses, permits, registrations, and governmental authorizations and approvals are deemed to have been, and hereby are, directed to be transferred to McFarlin upon consummation of the Closing as provided by the APA. To the extent provided by Bankruptcy Code section 525, no governmental unit may revoke or suspend any grant, permit, or license relating to the operation of the Sale Assets sold, transferred, assigned, or conveyed to McFarlin on account of the filing or pendency of this Chapter 11 Case or the consummation of the Proposed Sale.

14.    At the Closing of the transactions contemplated by the APA, McFarlin is hereby authorized in connection with the consummation of the Sale to allocate the applicable Sale Assets, among its Affiliates, agents, designees, assigns, and/or successors, in a manner as McFarlin, in its sole discretion, deems appropriate, and to allocate, assign, lease, sublease, license, sublicense, transfer, or otherwise dispose of any of the Sale Assets, to its Affiliates, agents, designees, assignees and/or successors, with all of the rights and protections afforded to McFarlin under this Sale Order and the APA with respect thereto, and the Debtor shall cooperate with and take all actions reasonably requested by McFarlin to effectuate any of the foregoing.

15.    This Sale Order shall be binding upon and shall govern the acts of all entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or

who may be required to report or insure any title or state of title in or to the Sale Assets. Each and every federal, state, and local governmental agency or department is hereby authorized to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the APA, including, without limitation, recordation of this Order.

16.    All entities that are presently, or immediately prior to the consummation of the Closing may be, in possession of the Sale Assets to be sold, transferred, or conveyed (wherever located) to McFarlin pursuant to the APA are hereby directed to surrender possession of the Sale Assets to McFarlin upon consummation of the Closing.

17.    Upon consummation of the Closing set forth in the APA, if any person or entity that has filed financing statements, mortgages, mechanic's liens, lis pendens, or other documents or agreements evidencing Interests or Claims against or in the Sale Assets shall not have delivered to the Debtor prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfactions, releases of all Interests or Claims that the person or entity has with respect to the Sale Assets (unless otherwise assumed in the APA), or otherwise, then: McFarlin is hereby authorized to file, register, or otherwise record a certified copy of this Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all Interests or Claims in the Sale Assets of any kind or nature (except as otherwise assumed in the APA). Each and every federal, state and local governmental unit is hereby directed to accept any and all documents and instruments necessary or appropriate to give effect to the Proposed Sale and related transactions.

18.    Effective as of the Closing Date, McFarlin (and any designees, assigns, and/or successors of McFarlin's rights under the APA) and its respective owners, members,

shareholders, managers, directors, officers, partners, employees, Affiliates, agents, attorneys, investment bankers and financial advisors are hereby generally released by the Debtor, its Affiliates, its estate and its owners, members, shareholders, managers, directors, officers, partners, employees, agents, attorneys, investment bankers and financial advisors from any and all claims that the Debtor and its Affiliates or estate or any party claiming derivatively through the Debtor may have against McFarlin, other than claims against McFarlin arising under the APA or as otherwise provided in this Sale Order.

19.    Effective as of the Closing Date, the Debtor, its estate, and its owners, members, shareholders, managers, directors, officers, partners, employees, Affiliates, agents, attorneys, investment bankers and financial advisors are hereby generally released by McFarlin and its Affiliates and their respective owners, members, shareholders, managers, directors, officers, partners, employees, agents, attorneys, investment bankers and financial advisors from any and all claims that McFarlin and its Affiliates may have against the Debtor, the Debtor's Affiliates and estate, other than claims against the Debtor, its Affiliates and estate arising under the APA or as otherwise provided in this Order (which excepted claims include, for the avoidance of doubt, the amount of McFarlin's remaining unsecured deficiency claim against the Debtor, its estate or the Debtor's Affiliates).

20.    As of and after the consummation of the Closing: (a) each of the Debtor's creditors is hereby authorized and directed to execute such documents and take all other actions as may be necessary to release their Claims or Interests in the Sale Assets (if any) as such Claims or Interests may have been recorded or may otherwise exist; and (b) any Sale Asset that may be subject to a statutory or mechanic's lien shall be turned over to McFarlin and such liens shall

attach to the sale proceeds in the same priority they currently enjoy with respect to the Sale Assets, unless otherwise specifically provided in the APA.

21.     The consummation of the Proposed Sale will not, and will not be deemed to, release, waive, compromise, modify, or otherwise affect in any manner whatsoever any Interests or Claims of any person or entity in, under, to, or against any assets or properties of the Debtor (including, without limitation, any Excluded Assets) that are not Sale Assets.

22.     If, after Closing, the Debtor, the Manager, or any other party receives or collects any amounts that constitute Sale Assets or the proceeds thereof, including, without limitation, with respect to any accounts receivable included in the Sale Assets, such payments will be held in trust for the benefit of McFarlin by the Debtor, Manager, or other party, and such party will not have any rights with respect thereto, and the Debtor, Manager, or other party, as applicable, shall promptly pay over such received payment to McFarlin. For the avoidance of doubt, any amounts received or collected that constitute Sale Assets or the proceeds thereof shall not become property of the estate as contemplated by Bankruptcy Code section 541 by virtue of such receipt or collection, and no liens shall attach to such amounts constituting Sale Assets by virtue of such receipt or collection.

23.     McFarlin shall not be liable for any claims against the Debtor, and the Debtor shall not be liable for any claims against McFarlin, in each case, other than as expressly provided for in the APA. McFarlin shall have no successor liability whatsoever with respect to any Claims or Interests or claims of any nature that may exist against the Debtor. Without limiting the foregoing, McFarlin shall not be, or be deemed to be, pursuant to any theory of law or equity: (i) a successor in interest or within the meaning of any law, including any revenue, successor

liability, pension, labor, ERISA, bulk-transfer, products liability, tax or environmental law, rule

or regulation, or any theory of successor or transferee liability, antitrust, environmental, warranty,

product line, de facto merger, mere continuation, or substantial continuity or similar theories; or

(ii) a joint employer, co-employer or successor employer with the Debtor or the Manager, and

McFarlin shall have no obligation to pay the wages, bonuses, severance pay, vacation pay,

WARN act claims (if any), benefits or any other payments to employees of the Debtor or its

Manager, including pursuant to any collective bargaining agreement, employee pension plan, or

otherwise, in each case (y) whether known or unknown as of the Closing, now existing or

hereafter arising, whether fixed or contingent and (z) except as expressly set forth in the APA.

24.    Time is of the essence in consummating the Proposed Sale. In order to maximize

the value of the Sale Assets, it is essential that the sale and assignment of the Sale Assets occur

within the time constraints set forth in the APA.

25.    The automatic stay provisions of Bankruptcy Code section 362 are modified to the

extent necessary to implement the terms and conditions of the APA and the provisions of this

Order.

26.    Effective upon the consummation of the Closing and except as otherwise provided

in this Order or the APA, all entities are forever prohibited and permanently enjoined from

commencing or continuing in any manner any action or other proceeding, whether in law or

equity, in any judicial, administrative, arbitral, or other proceeding against McFarlin, its

Affiliates, designees, successors, and assigns, or the Sale Assets, with respect to any: (a) Interests

or Claims arising under, out of, in connection with, or in any way relating to the Debtor, the Sale

Assets, or the operation of the Debtor's business or the Sale Assets prior to the consummation of

the Proposed Sale; or (b) successor liability by virtue of the consummation of the Proposed Sale contemplated by the Closing (except to the extent McFarlin assumed any such liability pursuant to the APA), including the following actions: (i) commencing or continuing in any manner any action or other proceeding against McFarlin, its Affiliates, successors, designees, assigns, assets, or properties, including with respect to the Interests or Claims; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against McFarlin, its Affiliates, successors, designees, assigns, assets, or properties; (iii) creating, perfecting, or enforcing any Interests or Claims against McFarlin, its Affiliates, successors, designees, assigns, assets, or properties; (iv) asserting any setoff, right of subrogation, or recoupment of any kind against any obligation due McFarlin, its designees, its successors, or assigns; (v) commencing or continuing any action, in any manner or place, that does not comply or is inconsistent with the provisions of this Order or other orders of this Court, or the agreements or actions contemplated or taken in respect thereof; or (vi) revoking, terminating, or failing or refusing to issue or renew any license, permit, or authorization to operate any of the Sale Assets or conduct any business operated with the Sale Assets.

27.    The Proposed Sale may include the transfer of "personally identifiable information" within the meaning of Bankruptcy Code section 101(41A).

28.    Following the Closing, no holder of a Claim or Interest in or against the Debtor or the Sale Assets shall interfere with McFarlin's title to or use and enjoyment of the Sale Assets based on or related to such Claim or Interest or any actions that the Debtor may take in this Chapter 11 Case or any successor case.

29.     The Debtor, including its respective officers, employees, and agents, is hereby authorized to execute such documents and do such acts as are necessary or desirable to carry out the transactions contemplated by the terms and conditions of the APA and this Order. The Debtor shall be, and they hereby is, authorized to take all such actions as may be necessary to effectuate the terms of this Order.

30.     The Proposed Sale contemplated by the APA, and entry into the APA, is undertaken by McFarlin without collusion and in good faith, as that term is defined in Bankruptcy Code section 363(m), and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Proposed Sale shall not affect the validity of the Proposed Sale (including the assumption and assignment of the Designated Contracts by McFarlin, and the Proposed Sale free and clear of all Interests or Claims in the Sale Assets (unless otherwise assumed in the APA)), unless such authorization and consummation of such Proposed Sale are duly stayed pending such appeal. McFarlin is a good-faith buyer within the meaning of Bankruptcy Code section 363(m) and, as such, is entitled to the full protections of Bankruptcy Code section 363(m).

31.     As a good-faith purchaser of the Sale Assets, McFarlin has not colluded with any other parties interested in the Sale Assets, and therefore neither the Debtor nor the Debtor's estates nor any other party in interest shall be entitled to bring an action against McFarlin or any if its Affiliates, assigns, designees, or successors, and the sale of the Sale Assets may not be avoided pursuant to Bankruptcy Code section 363(n).

32.     Nothing contained in any plan of reorganization or liquidation, or order of any type or kind entered in this Chapter 11 Case, any subsequent chapter 7 or chapter 11 case of the

Debtor, or any related proceeding subsequent to entry of this Order, shall directly conflict with or directly derogate from the provisions of the APA or the terms of this Order.

33.    The failure specifically to include any particular provisions of the APA, including any of the documents, agreements, or instruments executed in connection therewith, in this Order shall not diminish or impair the efficacy of such provision, document, agreement, or instrument, it being the intent of this Court that the APA and each document, agreement or instrument be authorized and approved in its entirety.

34.    All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

35.    To the extent there are any inconsistencies between the terms of this Order and the APA (including all ancillary documents executed in connection therewith), the terms of this Order shall govern.

36.    The APA and any agreements, documents, or other instruments related to the APA may be modified, amended, or supplemented by the parties thereto in accordance with the terms thereof without further order of this Court; provided, however, that any such modification, amendment, or supplement shall not modify the Purchase Price or any terms or provisions pertaining to the payment thereof or otherwise have a material adverse effect on the Debtor's estate unless approved by order of the Court after notice and a hearing.

37.    McFarlin is a party in interest and shall have the ability to appear and be heard on all issues related to or otherwise connected to this Order, the various procedures contemplated herein, and any issues related to or otherwise connected to the Proposed Sale or the APA.

38.    Nothing in this Order or the APA authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization or (e) approval, or the. discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under police or regulatory law.

39.    The provisions of this Order are nonseverable and mutually dependent.

40.    Notwithstanding Bankruptcy Rules 6004(h), 6006(d), 7062, and 9014, or any other law that would serve to stay or limit the immediate effect of this Order, this Order shall be effective immediately upon entry, and the Debtor and McFarlin are authorized to consummate the Proposed Sale immediately upon entry of this Order, in accordance with the APA.

41.    The Debtor is authorized to take all actions necessary to effectuate the relief granted pursuant to this Order.

42.    This Court shall retain jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Order and the APA, all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith to which the Debtor is a party or which has been assigned by the Debtor to McFarlin, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the APA or the Proposed Sale.

### ### END OF ORDER ###

Order submitted  by:


*/s/ Vickie L. Driver*
Vickie L. Driver
State Bar No. 24026886
Christina W. Stephenson
State Bar No. 24049535
Seth A. Sloan
State Bar No. 24098437
**CROWE & DUNLEVY, P.C.**
2525 McKinnon St., Suite 425
Dallas, TX 75201
Telephone: 214.420.2163
Facsimile:  214.736.1762
Email: vickie.driver@crowedunlevy.com
Email: crissie.stephenson@crowedunlevy.com
E-mail: seth.sloan@crowedunlevy.com

**COUNSEL FOR THE DEBTOR**